Cynthia Jo SAMUEL and Dena Meyers,
Individually, and on behalf of all oth-
ers similarly situated, Plaintiffs,

v.

UNIVERSITY OF PITTSBURGH et al.,
Defendants.

Civ. A. No. 71–1202.

United States District Court,
W. D. Pennsylvania.

June 6, 1975.

Michael Malakoff, Berger & Kapetan, Homer W. King, King, Bowman & Hanna, Richard R. Isaacson, James H. Joseph, Joseph & Hershman, P. C., Pittsburgh, Pa., for plaintiffs.

Israel Packel, Atty. Gen., Barry A. Roth, Deputy Atty. Gen., Thomas F. Halloran, Asst. Atty. Gen., James M. Arensberg, Tucker, Arensberg & Ferguson, Pittsburgh, Pa., Delbert McQuaide, John C. Gilliland, II, McQuaide, Blasko, Brown & Geiser, State College, Pa., Peter Platten, Richard Z. Freemann, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Frank P. Lawley, Jr., Chief Counsel, Robert P. Meehan, Counsel, Dept. of Auditor Gen., Legal Bureau, Harrisburg, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This protracted litigation is now before the Court for resolution of its final aspects. However, before the substantive aspects of the case may be dealt with it is necessary to resolve a preliminary matter.

### MOTION FOR DISQUALIFICATION

Counsel for plaintiffs, Michael P. Malakoff, has moved the Court to recuse itself under 28 U.S.C. § 144 and 28 U.S.C. § 455(b)(1). Section 144 of the Judicial Code reads as follows:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

The relevant portion of Section 455 (the remainder of the statute merely sets out definitions and specific grounds for disqualification, such as financial interests or blood relation to a party,

which are not alleged here) reads as follows:

"(a) Any justice, judge, magistrate or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." [1]

Section 3 of Pub.L. 93–512 provides: "This Act shall not apply to the trial of any proceeding commenced prior to the date of this Act [Dec. 5, 1974], nor to appellate review of any proceeding which was fully submitted to the reviewing court prior to the date of this Act." The above-captioned action was filed in 1971, some three years prior to the effective date of § 455(b)(1). However, since amended § 455 changes the original Section 455 [2] by liberalizing the disqualification procedure to favor the moving party,[3] I will consider both amended Section 455 and Section 144 to be equally applicable.

■ Initially, it is important to point out that the language of § 455(a) that disqualification is called for "in any proceeding in which [the judge's] impartiality might reasonably be questioned," does not amount to a grant of automatic veto power in order that counsel might choose a judge who meets with their approval. As stated by the Senate Judiciary Committee in discussing revised § 455:

"[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are, in fact, seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice." S.Rep.No. 93–419, 93d Cong., 1st Sess. 1973, p. 5 (emphasis in original).

■ The other applicable statute, 28 U.S.C. § 144, provides the means by which a litigant can file an affidavit of such bias or prejudice as is contemplated by § 455. Section 144 requires disqualification if the affidavit is sufficient, that is, based upon specific facts and reasons, rather than upon conclusory allegations and speculation. *Action Realty Co. v. Will*, 427 F.2d 843 (8th Cir. 1970). Although the facts stated in such an affidavit must be accepted as true [4] by the judge even though he knows them to be false (*Hodgson v. Liquor Salesmen's Union*, 444 F.2d 1344

---

1. Disqualifying knowledge of evidentiary facts is not here alleged.

2. Section 455 originally read as follows: "Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." June 25, 1948, c. 646, 62 Stat. 908.

3. Professors Wright and Miller contend that § 455's "drastic change" of eliminating the "duty to sit" concept in federal court [see *Simmons v. United States*, 302 F.2d 71 (2d Cir. 1962) and cases cited therein for an explanation of the concept], removes the impediment which had prevented counsel from gaining disqualification in the "great bulk of cases" in the past. Wright, Miller & Cooper Federal Practice & Procedure, § 3549, pp. 369–372 (1975).

4. Section 144 also specifically provides that the affidavit shall be accompanied by counsel's certificate that it is made in good faith. No such certificate accompanies Malakoff's affidavit.

(2d Cir. 1971)), the affidavit must be strictly construed against the party seeking disqualification. *Beland v. United States,* 117 F.2d 958 (5th Cir. 1941). "In sum, a judge must be presumed to be qualified, and there must be a substantial burden upon the affiant to show grounds for believing the contrary." *In re Union Leader Corp.,* 292 F.2d 381, 389 (1st Cir. 1961).

██ The judge who is the object of the affidavit must determine the factual and legal sufficiency of the motion and ascertain whether the facts alleged fairly support a charge of bias or prejudice. *Grimes v. United States,* 396 F.2d 331 (9th Cir. 1968); *Deal v. Warner,* 369 F.Supp. 174 (D.Mo.1973).

Malakoff's affidavit states that "plaintiffs and their attorneys believe that this court:

a. Has a personal prejudice against the law firm of Berger & Kapetan and those attorneys associated with it on this case;

b. Has a personal prejudice against those persons who sue 'charitable' state-related universities;

c. Has a personal prejudice against those persons who bring class actions."

██ The Court need not, of course, engage in point by point discussion or denial of the matters raised in such an affidavit in order to pass upon its sufficiency. The amendments to § 455 were not designed to encourage debate between the judiciary and the federal bar. Malakoff contends that 1) off-the-record statements made at conferences on April 19 and May 14, 1974, statements made off the record because they did not concern the subject of those conferences; and 2) the report of counsel from another firm of a private conversation I supposedly had during a 1973 Bench-Bar Conference; [5] and 3) my decision in an entirely unrelated case, support his allegations of prejudice.

It is of particular concern to me that counsel seems here to misapprehend the critical distinction between a Federal judge's expression of personal philosophy (which is certainly permissible) and his expression of an opinion on some facet of a particular case which is before him (which would be impermissible). This is especially so with regard to my alleged remarks at the 1973 Bench-Bar Conference. If this distinction did not apply, a judge could neither write books nor articles, nor could he speak on legal subjects. Indeed, he could not write opinions, since such a contention as asserted by Malakoff would then disqualify him from hearing subsequent cases involving the same points of law.

Unless it has been the intention of Congress that only ciphers be appointed to the federal bench (an absurd theory), the expression of opinion on legal matters is certainly permitted. Federal judges give, indeed are usually invited to give, their views in many different formal and informal situations. Almost invariably those views bear some relation to litigation which has been or will be before them. That counsel disagrees with a judge's opinion, so expressed, cannot be grounds for disqualification.[6]

---

5. I have no recollection of any such conversation or of the context in which the alleged comments were supposedly made.

6. An early draft of what is now Canon 3C(1)(a) of the Code of Judicial Conduct and 28 U.S.C.A. § 455(b)(1), would have called for disqualification if a judge "had a fixed belief concerning the merits." The change in language is explained in Thode, Reporter's Notes to Code of Judicial Conduct, 1973, p. 61: "The Committee was confronted, however, by the interpretation of many able judges and law professors that would require a judge to disqualify himself if he had a fixed belief about the law applicable to a given case. For example, it was argued that a judge with a fixed belief that the First Amendment precludes a libel action by a public official against a newspaper in the absence of proof of malice should disqualify himself in a libel case of that general

The definitive opinion on the permissible expression of a federal judge's personal philosophy, considered in a context of a motion to disqualify, is *Commonwealth of Pennsylvania v. Local Union 542*, 388 F.Supp. 155 (E.D.Pa.1974). Beyond noting that the alleged 1973 statements with which counsel takes issue could not have concerned attorneys' fees in this case because counsels' petition for such fees was not filed until March of 1975, there is little I can add to Judge Higginbotham's comprehensive discussion of the subject.

██ I have reviewed counsels' affidavit and find that the speculation and conclusory allegations contained therein [7] do not provide a basis upon which a reasonable man might discern prejudice or just reason for disqualification.

 Even if this were not so, however, an additional ground exists for the denial of Malakoff's motion. Under the standard of § 144, the reviewing judge is to test the affidavit not only for its sufficiency but also for its timeliness. The statute's reference to terms of court being obsolete, the inquiry into timeliness is concerned with the movant's reasonable diligence in filing such an affidavit. Even if it were assumed for the sake of argument that at the April and May 1974 conferences I had expressed the most callous indifference to plaintiffs' cause and made the most blatant

of prejudicial statements, which of course is not the case, nevertheless, in the thirteen months intervening, plaintiffs' counsel has, among numerous other things, 1) moved for an order directing judgment; 2) moved to certify the case under 28 U.S.C. § 1292; 3) prosecuted an unsuccessful appeal; 4) moved to compel the further-production of documents; and, 5) formally petitioned the court for attorneys' fees. As has been repeatedly held, the affidavit will be considered untimely if the affiant, after knowledge of the facts showing the supposed bias, has sought to invoke the court's affirmative action in his behalf before filing the affidavit. *In re Millman*, 439 F.2d 412 (4th Cir. 1971); *In re Union Leader Corp., supra; United States v. Gilboy*, 162 F.Supp. 384 (D.C. Pa.1958). However, since I have treated the standards of amended § 455 as if applicable in this case and found no bias for disqualification, I do not rely upon the untimeliness of the request.[8]

Malakoff's motion will be denied for the reason that the facts pleaded do not support the allegations of prejudice and thus do not warrant my disqualification. Neither the motion to recuse nor the affidavits appended thereto contain any fact which tends to lend any credence whatsoever to the general charge that this Court has a personal prejudice against Berger & Kapetan, anyone associated with that firm, or any party

character. This interpretation was not intended; indeed, the Committee recognized the necessity and the value of judges' having fixed beliefs about constitutional principles and many other facets of the law."

7. As in Judge Higginbotham's case, *supra* at 158, the affidavit's allegations "commingle conclusions with facts to an extraordinary degree." For instance, it is a fact that conferences in this case were held in April and May of 1974 and it is fact that I made off-the-record remarks at those conferences. It is also a fact that I attended a 1973 Bench-Bar Conference, although I was not a speaker or panelist at that function. Only an irrationally suspicious observer, however, would find that those innocuous facts lead to the conclusions Malakoff argues follow

therefrom: for instance, that I have "admitted" any bias, as counsel has the temerity to contend.

8. "Subsection (e) of the amended statute prohibits a judge from accepting from the parties a waiver of his disqualification where it is based on any of the specific situations set forth in subsection (b) . . . . [T]he committee believes that confidence in the impartiality of federal judges is enhanced by a more strict treatment of waiver." S.Rep. No. 93–419, 93d Cong. 1st Sess., 1973, p. 7. Since § 455(e) expressly disallows the use of formal stipulations of waiver, its import could be considered to vitiate the effect of those cases under § 144 wherein waiver by conduct was held to be controlling.

plaintiff who has brought this or any other class action against state-related universities. In sum, the motion appears to be a classic instance of a lawyer's attempt to mitigate his "fear that a judge may decide a question against him."

## PETITION FOR ATTORNEYS' FEES

This case now awaits resolution of the final issue involved—whether or not counsel for plaintiffs in this litigation are entitled to an award of attorneys' fees for their efforts. On March 3, 1975, plaintiffs and their counsel filed their joint petition for attorneys' fees and on March 12, 1975 I signed an Order setting April 18, 1975 as the date for an evidentiary hearing on the issue. However, on April 9, 1975, upon receipt of defendants' motion to consider the legal issue of whether and upon what basis attorneys' fees could be awarded to counsel prior to an evidentiary hearing, I reconsidered my earlier position and granted defendants' motion. The memorandum order of April 9 called for briefs on the issue, continued the evidentiary hearing until further order of court and set out the fundamental nexus of the point of view under which I now proceed—that "this Court cannot simply *assume* defendants' liability [for attorneys' fees] and proceed from there." p. 2 of slip opinion. If counsel were found to be entitled to an award of fees, then it is clear that the amount of that award would be determined in accordance with the standards set out in *Lindy Bros. v. American R & S Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). But in this case we start from the seemingly self-evident premise that the *Lindy Bros.* standards do not apply until a basis for an award of attorneys' fees has been found.

Until recently, absent statutory authority or an enforceable contractual obligation for attorneys' fees, such awards have been justified under three rationales:

"Even if statutory authority is lacking, in the exercise of their equitable powers federal courts may award attorneys' fees when the interest of justice so requires. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Although the rule is broadly stated, in application the power is generally exercised in three categories:

1. Where there has been bad faith, vexation, or oppression. In this class of cases, the punitive aspects predominate. *See e. g., Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *Monroe v. Board of Commissioners of City of Jackson*, 453 F.2d 259 (6th Cir. 1972).

2. Where a common fund has been created, or closely analogous to this, where a definable class benefits from the litigation and an award enables the court to spread the expense among all who benefit. *E. g., Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). *Cf. Brewer v. School Board of City of Norfolk*, 456 F.2d 943 (4th Cir.), cert. denied, 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136, *sub nom.* 409 U.S. 892, 93 S.Ct. 109, 34 L.Ed.2d 149 (1972).

3. Where the private attorney general theory may have application— that is, where the litigation was instituted to vindicate a policy granted a high priority by a congressional action. *See, e. g., Lee v. Southern Home Sites Corp.*, 444 F.2d 143 (5th Cir. 1971)." (footnotes omitted) *Goode v. Rizzo*, 506 F.2d 542 (3d Cir., 1974).

## PRIVATE ATTORNEY GENERAL THEORY

In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court expressly disapproved the use of the "private attorney general" theory in federal courts. The holding of the Court in reversing an award made

under that theory by the Court of Appeals for the District of Columbia could not have been more clear:

Since the approach taken by Congress to this issue has been to carve out specific exceptions to a general rule that federal courts cannot award attorneys' fees beyond the limits of 28 U.S.C. § 1923, those courts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts assessment of the importance of the public policies involved in particular cases. Nor should the federal courts purport to adopt on their own initiative a rule awarding attorneys' fees based on the private attorney general approach when such judicial rule will operate only against private parties and not against the Government. (footnotes omitted) *Id.* at 269, 95 S.Ct. at 1627.

█ The *Alyeska* opinion clearly forecloses resort to the private attorney general theory by plaintiffs' counsel in this case and eliminates the necessity for discussion of the theory. Nevertheless, subtle manifestations of what might be called "private attorney general thinking"—the loosely formulated effort to justify a fee by resort to such rhetoric as "therapeutic vindication of constitutional rights" remain to be discussed in counsels' petition.

## COMMON BENEFIT THEORY

From the outset in this case, plaintiffs' counsel has sought two remedies: injunctive relief and restitution. In this Court's April 10, 1974 opinion, (375 F. Supp. 1129) injunctive relief was granted and Rule B(2), the domiciliary presumption at issue here was declared void. In that April 1974 opinion, and in the conferences which followed, a procedure was set up for processing the claims for restitution assumed to be forthcoming as a result of the injunctive relief granted. Four people, all bringing claims against the University of Pittsburgh, came forward. On May 29, 1974 with the common benefit theory in mind, I ordered that:

"Defendant universities shall deduct ten percent (10%) of each amount paid in settlement to such persons [persons receiving restitution] to be used for payment of plaintiffs' attorneys' fees and costs in this case."

In the February 13, 1975 opinion, after a hearing, the four actual claims were analyzed and each claimant was found to be not entitled to restitution.

Judge Weis in *Goode v. Rizzo, supra,* defines the common benefit theory as permitting a discretionary award of attorneys fees "where a common fund has been created, or closely analogous to this, where a definable class benefits from the litigation." Thus, if a common fund or common benefit had been created, plaintiffs' counsel would have had the full benefit thereof. My Order of May 29, 1974 was made with the thought in mind that the class was sizeable and that each class member was potentially due a significant amount of money. I drew this implication both from the nature of the case itself and from the specific representations of plaintiffs' counsel. At the May 14, 1974 conference, for example, plaintiffs' counsel failed to deny his published statement that the class was comprised of approximately 2,000 persons each of whom was eligible to receive restitution in the amount of approximately a thousand dollars. (Transcript pp. 1–3). Of course, only four persons actually claimed restitution and none were found to be entitled to it.

█ In a logical and fair fashion then, given an assumed pool of claimants from which a counsels' fee could be drawn, the greater the benefit, the greater would have been the reward to plaintiffs' counsel. But, the converse result of this logical and fair common fund plan must also be accepted. Had

there been even one claimant found to be entitled to restitution, had there been a "common fund" in that sense, counsel would have received his proportionate fee out of that restitutionary award. However, no person has been found by this Court or, for that matter, found independently by the defendant universities, to be entitled to restitution.[9] It could hardly be more apparent that counsel can, as a result, receive no compensation using the common fund or common benefit rationale. There has been no common fund; there has been no common benefit. Therefore, there can be no award of counsel fee.

At this point, fully award of his failure to receive remuneration via the Court's plan, counsel cites *Mills v. Electric Auto-Lite Company*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) for the proposition that no requirement exists that the common benefit be pecuniary:

> "The fact that this suit has not yet produced, and may never produce, monetary recovery from which the fees could be paid does not preclude an award based on this rationale." *Id.* at 392, 90 S.Ct. at 625.

This statement is supported in the text of the *Mills* case only by reference to *Trustees v. Greenough*, 105 U.S. 527, 531–37, 26 L.Ed. 1157 (1882), a case in which it was recognized that in its equitable discretion a federal court could proportion an award to the trustee of a fund for the benefit of others out of that fund where the trustee had in some way protected or increased the funds' interests.[10] Thus, the *Greenough* case as well as the more modern enunciation of the common benefit theory both *assume* the existence of a monetarily quantifiable fund out of which an attorneys' fees may be awarded.[11] While it may be theoretically possible to award attorneys' fees using this rationale without the existence of a monetary fund, the case law, with the exception of the *dicta* in *Mills*, simply does not support the proposition.

In this regard, counsel also argues that he is entitled to offer expert testimony at an attorney fee hearing. He contends that a nationally known constitutional law expert will establish the benefit of enforcing constitutional rights at such a hearing. This seems irrelevant in view of *Alyeska Pipeline Service Co. v. Wilderness Soc., supra.* Plaintiffs' counsel cannot now hope to call the private attorney general theory by another name, and *ipse dixit* attach the label "common benefit" to his establishment through litigation of an abstract and technical point. This must be especially true where it has been conclusively shown that no monetarily valuable benefit has as yet come to any individual through his efforts.

The question involves a difficult and subtle distinction. After the elimination of the private attorney general rationale by the *Alyeska* case, it would seem that there remain only four exceptions to the

9. In the April 10, 1974 opinion the plaintiff class was decertified and potentially-affected students left free to pursue their own remedy. Such students and ex-students have received notice from the respective universities. Although to date no ex-class member has been found to be entitled to restitution, the possibility remains that attorneys' fees could still be generated from such a source.

10. In both *Mills, supra,* and *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702, (1973) where the common fund theory was applied, directly or indirectly, attorneys' fees were paid out of shareholder interests in a corporation and a union treasury respectively. See also the reference to *Greenough* in *Alyeska Pipeline, Id.* at 257, 95 S.Ct. at 1622 n. 30.

11. "To be sure, the usual case is one where through the complainant's efforts a fund is recovered in which others share. Sometimes the complainant avowedly sues for the common interest while in others his litigation results in a fund for a group though he did not profess to be their representative." Frankfurter, J. in *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 165, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939).

American rule of payment by each party of his own counsel fees:

1) statutory authorization
2) enforceable contractual obligation
3) bad faith
4) common fund

To my thinking, previous cases which have awarded fees using a "common benefit" rationale—that is, awarded fees in the absence of monetarily quantifiable benefit—have in reality involved the less-than-precise application of the private attorney general rationale, for without a fund, out of which it can apportion fees, the Court is left to justify the very shifting of fees to the unsuccessful party expressly disapproved in *Alyeska*. The fundamental thesis of *Alyeska* is that Courts may not award fees upon so vague a basis as that used by the lower court—the "vindication of important rights," 495 F.2d at 1032, cited at 421 U.S. 245, 95 S.Ct. p. 1616. Absent a monetarily quantifiable fund, what justification remains for imposition of the "common benefit" theory other than the "vindication of important rights.?" [12]

## BAD FAITH THEORY

The third and final theory under which counsel hopes to proceed is the bad faith theory of attorneys' fees, applicable where defendants have acted vexatiously, wantonly or for oppressive reasons. *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). The bad faith theory, however, which I found to be applicable when I awarded fees in *Commonwealth of Pennsylvania v. Charleroi School District*, 63 F.R.D. 440 (W.D.Pa.1973),[13] is simply not applicable to the facts of this case.

By letter to the Court dated May 7, 1975 counsel for plaintiffs contend for the first time that the bad faith theory is applicable. Heretofore, most conspicuously in his brief in support of his petition for attorneys' fees, counsel had not directly contended that the theory was herein applicable. In citing Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a case which involved the immunity of school board officials to actions under § 1983, plaintiffs' counsel comes closest to raising the bad faith issue. The holding of *Wood v. Strickland* was as follows:

"We hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected . . .. The official must himself be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indis-

---

12. "Congress itself presumably has the power and judgment to pick and choose among its statutes and to allow attorneys' fees under some but not others. But it would be difficult, indeed, for the courts without legislative guidance to consider some statutes important and others unimportant and to allow attorneys' fees only in connection with the former. If the statutory limitation of right-of-way widths involved in this case is a matter of the gravest importance, it would appear that a wide-range of statutes would arguably satisfy the criterion of public importance and justify an award of attorneys' fees to the private litigant. And, if *any* statutory policy is deemed so important that its enforcement must be encouraged by awards of attorneys' fees, how could a court deny attorneys' fees to private litigants in § 1983 actions seeking to vindicate *constitutional* rights?" *Alyeska, supra* at 263, 95 S.Ct. p. 1625. (emphasis in original)

13. As stated by Senior Judge Gourley of this Court in Gray v. Creamer, 376 F.Supp. 675, p. 682 (W.D.Pa.1974): "In the *Charleroi School District* case, the question of a right of a school district to regulate hair length had already been clearly and unequivocally decided, and there is no question that, although no finding of bad faith was made in the *Charleroi* case, the Charleroi School District was knowingly acting outside the law."

putable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice." *Id.* at 322, 95 S.Ct. at 1001.

Indisputably, *Wood v. Strickland* does no more than set out the standard by which an official's claimed immunity may be tested. The case does not change in any way contrary to any ruling by this Court the burden of proof as to proving or disproving bad faith. Nor does it follow from the fact that neither counsel nor the Court had the benefit of the *Wood v. Strickland* holding during any previous proceeding that the case in any way mandates additional hearings on the bad faith issue.

 Counsels' eleventh hour interposition of the bad faith issue will not be accepted, not because it is untimely, nor because the doctrine's punitive aspect is inappropriate here, but because there is absolutely no evidence in this record which would support such a finding by the Court. I found specifically in the April 10, 1974 opinion that there was "no suggestion whatever of bad faith in the enforcement of residency rules by any party to this action . . . " 375 F.Supp. at 1129, n. 12. From the outset counsel has contended and this Court has found that the presumption of a married female student's domicile which this Court previously struck down was a rule of the Auditor General of the Commonwealth of Pennsylvania which the three defendant universities, by virtue of their financial and administrative relationship with the Commonwealth, were obliged to have on their books, if not follow.[14] Under these facts, to contend that attorneys' fees could be awarded by calling defendant universities' action bad faith would be to stretch the limits of reason and logic to the breaking point. Counsel contends in the May 7 letter that a hearing is necessary for him to adduce facts substantiating his newly-propounded bad faith claim, but in the nearly four years that this case has been on the docket, and in the writing of the several opinions in the case, the facts, as set out at some length in previous opinions and in the parties' briefs, affidavits and depositions, have become clear. Counsels' only realistic hope is not to adduce additional facts, but to put a new construction on facts already well-known to the court.[15] The defendant universities will not be held to have acted in bad faith where their administration of the Auditor General's rule was non-discretionary throughout the period in question.

Within the context of the *Wood v. Strickland* standard, I find that there is no evidence that any official of any defendant university acted otherwise than sincerely and in the belief that he or she was doing right in regard to the issues in question in this case. I find that there is no evidence to indicate that any official knew or should have known that his actions would violate any student's constitutional rights.

Counsel for plaintiffs, ignoring the fact that no student's constitutional rights have been shown to be adversely affected, argues that defendant university officials should have known their conduct would adversely effect students' rights sometime after the Supreme Court decision in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225, was handed down in November of 1971. If

---

14. The evidence leaves a great deal of doubt as to whether the rule was *ever* actually imposed or at least ever imposed to the prejudice of any individual. See the Opinion of February 13, 1975 and the comments on this question in the discussion of the common fund rationale.

15. It is noted that there was a full hearing on liability and also on the contentions of named plaintiffs for reimbursement. Counsel has had more than adequate opportunity to show bad faith if any had existed. He has not shown any evidence of this. An additional bite of the apple is simply not warranted under the circumstances.

*Reed v. Reed* were accepted *arguendo* as having made the matters at issue in the case *sub judice* "settled, indisputable law," a point which is open to considerable controversy,[16] counsel would apparently have this Court find defendant university officials liable as acting in bad faith where their action *might have* prejudiced students' rights. Counsel's argument is one of transcendent illogic. Where the defendant university officials have been found to have acted sincerely, where no person has as yet been found to have been injured by their actions and where, at worst, the defendants acted throughout in peril of violating federal standards by following contradictory state standards, they cannot and will not be found liable for acting in bad faith.

Based upon all the considerations discussed above. I have no option but to reach the same conclusion as that reached in *Seaman v. Spring Lake Park,* 387 F.Supp. 1168 (D.Minn.1974): The petition for attorneys' fees must be denied. There is simply no basis for an award of attorneys' fees in this case. Because no such award will be granted there is no need to pass upon the question of whether defendant state officials are liable for attorneys' fees. See *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Skehan v. Board of Trustees,* 501 F.2d 31 (3d Cir. 1974).

The foregoing shall constitute findings of fact and conclusions of law in accordance with F.R.Civ.P. 52(a). An appropriate Order in accordance with this Opinion shall be entered.

16. At paragraph 8 of his petition for attorneys' fees counsel states: "The plaintiffs' success in this case was highly contingent and initially dependent in part on the resolution of a number of issues by the United States Supreme Court, Third Circuit Court of Appeals and other courts during the intervening three years." Counsel would presumably like to have it both ways so as to be able to argue at once that his "success" was highly contingent, yet that defendant officials should have known their actions were illegal. If counsel himself was less than certain throughout of just what constituted "settled, indisputable law" in this regard, it becomes difficult, if not impossible, to hold defendant officials liable for acting in bad faith.