Brau Ramírez, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
I
La peticionaria, Elba I. Santiago Rodríguez, quien se desempeña como Juez Municipal, solicita la revisión de una resolución emitida el 4 de enero de 2001 por el Tribunal de Primera Instancia, Sala Superior de Ponce, que, a instancias del Ministerio Público, ordenó la descalificación de la peticionaria en todos los procedimientos que pudieran presentarse ante ella bajo la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989, según enmendada, 8 L.P.R.A. sees. 601 y ss.
Mediante resolución emitida el 2 de marzo de 2001, concedimos término al Procurador General para que compareciera a mostrar causa por la cual no debíamos expedir el recurso solicitado y revocar la resolución recurrida.
El Procurador General ha comparecido por escrito.
Procedemos según lo intimado.
II
Según se desprende del expediente, para la fecha relevante al presente recurso, la peticionaria se desempeñaba como Magistrado Instructor en la Sala de Investigaciones del Centro Judicial de Ponce. Presidía, entre otras, las vistas de determinación, de causa probable para arrestar por violaciones a la citada Ley para la Prevención e Intervención con la Violencia Doméstica y emitía órdenes de protección bajo dicho estatuto.
Alegadamente, durante la celebración de varias vistas de causa probable bajo la citada Ley, la peticionaria realizó numerosas expresiones y tomó determinaciones que causaron malestar a las partes pequdicadas, policías y Fiscales.
Como consecuencia de estos incidentes, el Ministerio Público presentó una querella contra la Juez Santiago ante la Oficina de Administración de Tribunales, alegando que dicha Juez estaba parcializada contra las mujeres *777 víctimas de violencia doméstica. Alegadamente, el Secretario de Justicia también envió una carta a la Directora Administrativa de los Tribunales, advirtiéndole que las alegadas actuaciones de la peticionaria podrían constituir discrimen por razón de género.
La peticionaria contestó la querella, negando las imputaciones en su contra.
El 5 de octubre de 2000, mientras este trámite se hallaba pendiente, el Ministerio Público presentó ante el Tribunal de Primera Instancia, Sala Superior de Ponce, un escrito titulado "Petición de Inhibición de la Hon. Elba Santiago" en el que se solicitaba que se ordenara la descalificación de la peticionaria de todo caso relacionado con la determinación de causa probable o la emisión de órdenes de protección bajo la Ley Núm. 54, debido a que ésta estaba parcializada en contra de las víctimas.
La solicitud del Ministerio Público no fue presentada dentro de proceso judicial alguno, sino que fue instada ex parte por Fiscalía. La misma estaba apoyada por varías declaraciones juradas en tomo a distintos incidentes relacionados a procesos bajo la Ley Núm. 54.
Los incidentes eran los siguientes:
“1. Con relación al caso de El Pueblo de Puerto Rico v. José Oían Santiago, e] agente José L. Torres Santiago se quejó de que había llevado un caso ante la Juez quien le indicó que "no iba ver el caso en ausencia y ni siquiera iba firmar la Orden de Protección porque ella por experiencia propia entendía que las mujeres pedían orden de protección los fines de semana para sacar los hombres de la casa y después el lunes se echaban para atrás y no quiso ver el caso".
2. Con relación al caso de El Pueblo de Puerto Rico v. Omar Ali Abdel Aziz, la agente Glenda E. Vega Cartagena relató que la Juez no la había dejado hablar y que le había preguntado a la perjudicada: "¿ Usted tiene otro hombre? Porque aquí las mujeres vienen a pedir una Orden de Protección cuando quieren dejar al hombre que tienen." La Juez expidió una Orden de Protección por cinco días.

3. En el caso de El Pueblo de Puerto Rico v. Jesús Torres González, la perjudicada Denisse de la Cruz Ortiz relató que luego de haber expresado su versión de los hechos, la Juez le había dicho que lo que había sucedido "no era Ley 54, lo que se llamaba eso era un problema matrimonial". La Juez expresó que no encontraba causa, porque él se veía un "muchacho decente" y que porque "hoy en día las mujeres estaban tomando esto de relajito". Que cada vez que el marido le diga "puta", "pendeja", vienen a buscar una Orden de Protección y a ponerle Ley 54. ”

También dijo: "yo se que esa fiscal se va a ir en alzada, porque ella se cree que todos los casos que lleguen son de violencia domestica". La Juez emitió una orden de protección.

“4. En El Pueblo de Puerto Rico v. Luis R. Venegas Giron, la perjudicada Catherine J. Nolasco Ortiz narró que había presentado una denuncia por violación a una orden de protección, originalmente emitida por la peticionaria y que, mientras esperaban por la Juez, una persona se reunió con el imputado, quien estaba acompañado por el padre de él y su abogado. Esa persona luego se reunió a solas con la Juez y luego salió y les habló.”

Relató que durante la vista, la Juez la acusó de no ser buena madre porque ella se había enfermado en una ocasión, teniendo el imputado que hacerse cargo de su hijo, y porque ella lactaba a su bebé de forma alterna. La Juez le dijo que ella lo lactaba "cuando le daba la gana". Manifestó que el imputado era un padre preocupado por su hijo y determinó no causa por la denuncia.

“5. En El Pueblo de Puerto Rico v. Michael M. Cintron Díaz, la agente Elsa León Torres relató que al entrevistar a la perjudicada, la Juez le preguntó que "¿si ella quería que su esposo fuera preso?", a lo que la *778 perjudicada contestó que no. La Juez le preguntó a la agente: "¿qué cree usted de este caso?" y ella replicó que "la función mía es traerle el caso al Tribunal, la determinación la toma usted". Luego la Juez manifestó "no voy a determinar causa por un simple halón de pelo". Le dijo a la perjudicada que si ella se sentía amenazada de. muerte que pidiera una orden de Protección al Tribunal y al acusado le dijo "recórtese la moruza esa. ”
6. En El Pueblo de Puerto Rico v. Humberto Vázquez Cruz, la perjudicada Gladys Carrero González declaró en tomo al siguiente incidente:

"¿Qué sucedió una vez usted se encuentra ante la presencia de la Juez Elba Santiago? Pues, allí estábamos el policía Díaz, otro policía, Humberto [el imputado] y yo con mi nena en los brazos. La juez me preguntó qué era lo que había pasado y yo le expliqué. Ella me dijo qué donde estaba la marca, que yo era blanca y se supone que tuviera una marca si él me había dado. Le preguntó al policía si me había visto marcas y el policía le contestó que cuando él me entrevistó sí tenía marcas en los cachetes y el cuello. Entonces, cuando yo llegué de primera instancia la juez me miró mal y me dijo qué como ella me va a atender con un muchacho gritando, que ella no podía escucharme, ni me podía decir nada con el trapo de muchacho encima gritando y llorando. Entonces, me preguntó las palabras y cuando yo le dije que me había dicho puta, le preguntó a él que si yo era puta que se buscara una monja, que no saliera, ni estudiara. Entonces, me dijo a mí que yo no estudiara y me pusiera a atender a mi marido y ala nena. Entonces, me dijo que no iba a encontrar causa, ni por marcas, ni por la menor de edad porque ella no entendía y mandó a quitarle las esposas a Humberto y le dijo que no se acercara a mí."

7. En el caso de El Pueblo de Puerto Rico v. Héctor Echevarría Feliciano, la agente Naida López Maldonado declaró:

"[Sje llevó el caso ante la Juez Elba Santiago, quien luego de escuchar a la querellante que le manifestó tener un caso pendiente para juicio contra el mismo caballero.... La juez me contestó que cómo era posible que yo le llevara a esta persona si ya tenía un caso pendiente en el Tribunal y el mismo no se había terminado. Me indicó además, que tenía que esperar a que se viera ese caso porque de lo contrario, se lo iba a seguir llevando 5, 10 y 15 veces. La juez manifestó no iba a encontrar causa probable porque ya el sospechoso estaba siendo procesado por el Tribunal por Ley 54 en aquel caso."

8. En el caso de El Pueblo de Puerto Rico v. José J. Velázquez Matos, el agente Héctor L. Acosta Quiñones narró que:
"Cuando pasamos ante la juez, el arrestado, la perjudicada, su hija y yo, la juez ojeó las denuncias y preguntó que si la muchacha era hija de ellos. Yo le dije que sí e inmediatamente la juez dijo "el agente y la hija fuera" y nosotros salimos. Pasaron como 10 minutos y el alguacil me fue a buscar y me dijo que yo entrara y yo entré y la juez me preguntó que yo creía que podíamos hacer con ese caso, ya que el señor no tenía trabajo y no tenía quien lo fiara y la señora no quería que fuera preso. Yo le dije que ella era la que mandaba. La juez me preguntó que si no me daba pena con él porque él estaba llorando. Yo le dije que no me daba ninguna porque a él no le dio ninguna pena cuando le dio a la señora. La juez me dijo que iba a archivar el caso y que yo hablara con la hija afuera porque cuando se trataba de padres e hijos, ella no entrevistaba a los hijos."
9. En El Pueblo de Puerto Rico v. Pedro García Torres, la perjudicada Elizabeth Hernández González narró:

"Ella [la Juez] me preguntó que como él había violado la orden de protección. Yo le dije que había entrado a mi casa. Le conté que cuando solicité la orden de protección, [se] le ordenó a Pedro que entregara las llaves y no lo hizo. Ahí ella me preguntó que porqué yo no había cambiado las cerraduras de mi casa. Yo le dije que yo había cambiado los candados de las rejas, pero la casa es através de Sección 8 y la dueña de la casa no quería cambiar las cerraduras. Ahí fue que la Juez empezó á contarme que cuando ella se dejó del marido, ella lo botó de la casa y cambió todas las cerraduras para que él no pudiera entrar, que porqué yo no había hecho 
*779
lo mismo que ella. Yo le dije a ella que yo no había buscado ayuda por las amenazas de él y que como el siempre decía que si yo lo metía preso me mataba, además, él siempre se pasa diciendo que iba a salir porque la justicia se vende y él estaba para comprarla. Ella le dijo al alguacil: 'Sácala, refiriéndose a mí. Me llevaron hasta el pasillo, donde originalmente yo estaba. Pasaron como cinco minutos y entró Pedro acompañado del abogado y me dijeron que entrara nuevamente. El abogado de Pedro se le acercó a la Juez y habló con ella a solas. Se retiró otra vez al lado de Pedro y se presentó como el abogado de Pedro. Nos dijeron que levantáramos la mano y nos tomaron juramento. El policía habló y dijo que la mamá de Pedro había dicho que Pedro había estado en la casa porque él no acostumbraba salir de noche porque la mujer que tiene lo visita en la casa. La Juez me dijo que le contara lo que pasó. Yo empecé a contarle, pero no me dejó casi ni hablar porque ella y el abogado empezaron a decir que lo que yo tenía eran celos y por eso me había inventado, todo eso y que eso eran mentiras. El abogado se estaba riendo. Ahí fue cuando la Juez le preguntó a Pedro que si era verdad que la justicia se compraba. Pedro se quedó callado. No contestó. La Juez le dijo a Pedro que le preguntara a su abogado que si la justicia se compraba o no. El abogado empezó a decir que. eran celos y traté de hablar con la Juez para tratar de contarle lo que Pedro me había hecho esos días, pero ella no me dejaba hablar y repetía lo mismo que decía el abogado, que eso eran mentiras y que yo estaba celosa, que eran celos. ...La Juez determinó que no había causa en ninguno de los dos casos. Ella me miró y me dijo que aquí no se venía a mentir, que yo era la que estaba mintiendo porque tenía celos."

10. La Sra. Lourdes A. Rodríguez Rodríguez, Trabajadora Social de la Comisión de Asuntos de la Mujer en el Centro Judicial de Ponce, declaró que había escuchado a la Juez Santiago comentar que "las Ordenes de Protección eran tonterías de las mujeres por cualquier cosa que le hacían los esposos y que ella no era trabajadora social y que eso le tocaba a las trabajadoras sociales de... [la] Oficina de la Comisión de Asuntos de la Mujer, que no están haciendo su trabajo... ”.

A base de los incidentes relatados, el Ministerio Público solicitó que se ordenara la descalificación de la Juez en todo incidente bajo la Ley Núm. 54.
A pesar de que, según indicado, la solicitud del Ministerio Público no fue presentada dentro de procedimiento judicial alguno, la misma fue referida por el Juez Administrador a la Sala recurrida el 13 de noviembre de 2000, para que se procediera a adjudicar la moción.
Oportunamente, la peticionaria compareció y presentó una Oposición a la solicitud presentada por el Estado, negando las imputaciones hechas en su contra y argumentando que no se había demostrado un prejuicio personal de su parte en la aplicación de la Ley Núm. 54. La peticionaria solicitó la paralización de la vista, lo que fue denegado por el Tribunal de Primera Instancia.
Luego de otros incidentes, el asunto fue sometido ante el Tribunal a base de los documentos.
El 4 de enero de 2001, mediante la resolución recurrida, el Tribunal de Primera Instancia determinó que la peticionaria debía inhibirse de actuar como juez en todos los casos de infracciones a la Ley Núm. 54 o solicitudes de órdenes de protección bajo dicho estatuto.
En su resolución, el Tribunal concluyó que "las expresiones y manifestaciones realizadas por la Hon. Jueza podrían denotar 'un juicio previo' o falta de neutralidad judicial’ hacia la mujer. Crean la apariencia de que las mujeres no son víctimas reales de violencia doméstica o, en su defecto, que el maltrato recibido ha sido provocado por ellas mismas."
Insatisfecha, la peticionaria acudió ante este Tribunal.
III
En su recurso, la peticionaria plantea que erró el Tribunal de Primera Instancia al ordenar su inhibición en todos los casos bajo la Ley Núm. 54, a base de una prueba escasa e insuficiente en derecho.
*780 Creemos que el Tribunal efectivamente incidió al emitir el dictamen impugnado.
La Regla 76 de las de Procedimiento Criminal autoriza al Ministerio Público o -a la-defensa a solicitar la inhibición de un juez por los fundamentos contemplados en dicho precepto, los que incluyen "que el Juez tenga opinión formada o prejuicio a favor o en contra de cualquiera de las partes, o haya prejuzgado el casó." 34 L.P.R.A. Ap. II, R. 76.
Este precepto es similar a la Regla 63.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. HI, R. 63.1, la cual establece como fundamento para la descalificación de un juez, inter alia, el "estar interesado en su resultado o tener prejuicio o parcialidad personal hacia cualquiera de las partes o sus abogados", así como por cualquier otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia." Véase, Nudelman v. Ferrer Bolívar, 107 D.P.R. 495, 506 (1978); Véase, José Cuevas Segarra, Práctica Procesal Puertorriqueña: Procedimiento Civil, Publicaciones Inc., 1979, a las págs. 425 y ss.
Las Reglas citadas son, además, similares a otros estatutos vigentes en la jurisdicción federal. Véanse, 28 U. S.C. sees. 144, 455; véase, en general, Wright, Miller & Cooper, Federal Practice and Procedure, Vol. 13A, West Publishing Co., St. Paul, Minn., 1984, a las págs. 548 y ss.
Ahora bien, es un principio fundamental de nuestro ordenamiento que los remedios judiciales generalmente sólo pueden ser concedidos cuando existe un caso o controversia real entre litigantes que se verían verdaderamente afectados por el pronunciamiento que emita el Tribunal. Véase, E.L.A. v. Aguayo, 80 D.P.R. 552, 601 (1958); véanse, además, First National Mortgage Assoc. v. Corchado Román, 145 D.P.R._(1998), 98 J.T.S. 35, a la pág. 734; P.P.D. v. P.N.P., 140 D.P.R. 52, 54 (1996); Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 721 (1980).
El poder de un juez de ordenar la descalificación de un compañero, en aquellas circunstancias en que dispone la ley, de este modo, es incidental a la función judicial. Este poder no se interpreta de manera liberal. El mismo sólo puede ser aplicado dentro del contexto de un proceso judicial y siguiendo el procedimiento establecido por ley. Compárese, Departamento de la Familia v. Soto, 147 D.P.R._(1999), 99 J.T.S. 91, a la pág. 639. La Regla 76 de las de Procedimiento Criminal así lo dispone, al establecer que la inhibición puede solicitarse en "cualquierproceso criminal". 31 L.P.R.A. Ap. II. R. 76.
En ausencia de dicho contexto, un Juez carece de competencia para determinar cuáles casos pueden o no ser atendidos por un compañero. Esa es una determinación administrativa, no judicial, que por diseño constitucional pertenece exclusivamente al Juez Presidente del Tribunal Supremo de Puerto Rico y, por delegación suya, a los Jueces Administradores de la Rama Judicial. Véase, la Regla 7 de las de Administración del Tribunal de Primera Instancia, 4 L.P:R.A. Ap. H-B, R. 7.
En la situación de autos, según hemos visto, la solicitud de inhibición contra la Juez Santiago no constituyó un incidente de proceso criminal alguno, sino que fue presentada de forma ex parte por el Ministerio Público, quien solicitó que se prohibiera a la peticionaria intervenir en todo caso bajo la Ley Núm. 54.
La amplitud y abstracción de los términos en que se formuló la solicitud del Ministerio Público tienden a sugerir, precisamente, que la determinación interesada tenía un carácter administrativo, más bien que judicial. En lugar de requerir al Tribunal que enfocara su atención en una controversia particular y determinara sobre la capacidad y aptitud de la Juez Santiago Rodríguez de adjudicar la misma de forma imparcial, se invitó al Tribunal a realizar una evaluación del temperamento de la peticionaria, de manera desconectada con los méritos de algún caso específico. Creemos que este tipo de evaluación pertenece al ámbito disciplinario, el cual es de la competencia exclusiva del Tribunal Supremo de Puerto Rico y del Juez Presidente de dicho foro, en la capacidad administrativa antes mencionada.
*781 Aunque el tipo de descalificación general ordenada por el Tribunal tal vez pueda ser admitida en algunas circunstancias, estimamos que, en la presente situación, este remedio no podía ser aplicado por el Tribunal, en ausencia de la existencia de un caso específico que diera base a la solicitud de inhibición.
La solicitud del Ministerio Público estaba basada en la alegada parcialidad de la Juez Santiago Rodríguez contra las mujeres, en casos bajo la Ley Núm. 54.
El Tribunal Supremo de Puerto Rico ha aclarado que el tipo de prejuicio o parcialidad que da lugar a la recusación de un juez, es aquél de origen extrajudicial, y no el que surge por haberse familiarizado el magistrado con el caso a través del procedimiento. Véase Pueblo v. Maldonado Dipiní, 96 D.P.R. 897, 910 (1969); Pueblo v. Pacheco, 83. D.P.R. 285, 289-291 (1961); véase, además, Cuevas Segarra, supra, a la pág. 428; Véase, Wright, Miller & Cooper, supra, sec. 3542, a la pág. 559; Liteky v. United States, 510 U.S. 540, 554-555 (1994); U. S. v. Grinnell Corp., 384 U.S. 563, 583 (1966); In re: Cooper, 821 F. 2d 833, 838 (1st. Cir. 1987); U.S. v. Gordon, 634 F. 2d 639 (1st Cir. 1980).
No constituye fundamento para solicitar la recusación de un juez, el que éste hubiera manifestado una opinión definida en cuanto a los méritos de un caso o que hubiera fallado en contra de una parte en otros incidentes. Véase, Wright, Miller & Cooper, supra, sec. 3542, a las págs. 559-568; véase, Laird v. Tatum, 409 U.S. 824 (1972); Southern Pacific Communications v. American Tel. and Tel. Co., 740 F. 2d 980, 990-991 (D. C. Cir. 1984); Rosquist v. Soo Line R.R., 692 F.2d 1107, 1112 (7th Cir. 1982).
El estándar utilizado para la recusación de un juez por la apariencia de imparcialidad es uno esencialmente objetivo: si una persona razonable, en conocimiento de todas las circunstancias, tendría dudas sobre la imparcialidad del juez. Véase, In re: Campoamor Redín, 150 D.P.R._(2000) 2000 J.T.S. 25, a la pág. 592; véase, además, Wright, Miller & Cooper, supra, a la pág. 612; véase, también, U.S. v. Greenough, 782 F. 2d. 1556, 1558 (11th Cir. 1986); Union Carbide Corp. v. U.S. Cutting Service, Inc., 782 F. 2d. 710, 715 (7th Cir. 1986); U. S. v. Nelson, 718 F. 2d. 315, 3221 (9th Cir. 1983).
Este estándar, sin embargo, se aplica restrictivamente en contrá de la parte que solicita la recusación. Véase, Wright, Miller & Cooper, supra, sec. 3549; a las págs. 623-624; Town of East Haven v. Eastern Airlines, Inc., 304 F. Supp. 1223, 1225 (D. Conn. 1969).
Como es natural, aunque una parte tiene derecho a que su causa sea dilucidada por un juzgador imparcial, no existe derecho alguno a tener un juez de su preferencia, ni a vetar la participación de un juez que no se desea. Véase, Meléndez Vega v. Caribbean International News, 151 D.P.R._(2000), 2000 J.T.S. 108, a la pág. 1,405; McCuin v. Texas Power & Light Co., 714 F. 2d. 1255, 1262 (5th Cir. 1983); Blizard v. Felding, 454 F. Supp. 318, 321 (D. Mass. 1978), aff'd, 601 F. 2d. 1217 (1st. Cir. 1979); Samuel v. University of Pittsburgh, 395 F. Supp. 1275, 1279 (W.D. Pa. 1975).
La incomodidad que pueda sentir un abogado hacia un juez la particular, no es una base para la recusación’ de este último. Ruiz Rivera v. Pepsico de Puerto Rico, Inc., 148 D.P.R._(1999), 99 J.T.S. 95, a la pág. 1,157.
La Regla 77 de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 77, requiere que la moción de inhibición sea juramentada y que exponga los fundamentos en los que se apoya. Véase, además, la Regla 63.2 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 63.2; 28 U.S.C. see. 144.
Estas declaraciones juradas también se interpretan restrictivamente en contra de la parte promovente, Wright, Miller & Cooper, supra, a las págs. 631-633; U.S. v. Sykes, 1 F. 3d. 1331, 1339 (7th Cir. 1993); Selfridge v. Gynecol, Inc., 564 F. Supp. 57, 58 (D. Mass. 1983); véase, además, In re: Union Leader Corp., 292 F. 2d. 381, 389 (1st. Cir. 1961).
*782 En la situación de autos, hemos examinado la moción presentada por el Ministerio Público. Aunque coincidimos con dicha parte en cuanto a que muchos de los comentarios atribuidos a la peticionaria resultarían impropios y reflejan un trato poco cortés a los litigantes, cf., In re: Maldonado Torres, 152 D.P.R._(2000), 2000 J.T.S. 199, no estamos persuadidos de que los mismos sean suficientes para apoyar la conclusión de que la peticionaria está incapacitada para adjudicar cualquier controversia bajo la Ley Núm. 54, de forma imparcial.
Los incidentes mencionados, según indicado, dieron base para la presentación de una querella disciplinaria contra la peticionaria, trámite que aún se encuentra pendiente.
Es evidente, a base de los mismos, que existe tirantez entre el juez y los representantes del Estado, y que éstos desconfían de la primera. Pero dicha tirantez por sí sola no debe dar base a la recusación de la peticionaria. Wright, Miller & Cooper, supra, a la pág. 573; People Helpers Foundation, Inc. v. City of Richmond, Va., 12 F.3d. 1321 (4th Cir. 1993); In re: Drexxel Burham Lambert, Inc., 861 F.2d. 1307 (2nd Cir. 1988); In re: Cooper, supra, 821 F. 2d., a las págs. 838-839; Watson v. Miears, 772 F. 2d. 433, 437 (8th Cir. 1985); Gilbert v. City of Little Rock, Ark, 722 F. 2d. 1390,1398-1399 (8th Cir. 1983).
Reconocemos que el Ministerio Público ha estado insatisfecho con distintas decisiones de la peticionaria, pero no está claro que ello implique que la peticionaria no pueda emitir un dictamen imparcial en los casos bajo la Ley Núm. 54.
En cualquier caso, según hemos observado, no podía solicitarse la recusación de la peticionaria, en ausencia de un proceso judicial que así lo hiciese necesario.
Por los fundamentos expresados, se expide el auto y se revoca la resolución recurrida.
Lo acordó y manda el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General