PARTIDO POPULAR DEMOCRÁTICO, ETC., demandantes y recurridos, *v.* PARTIDO NUEVO PROGRESISTA, ETC., demandados y recurrentes.

*Número:* CT-95-10          *Resuelto:* 16 de febrero de 1996

*Guillermo de Guzmán Vendrell* y *Luis Berríos Amadeo*, abogados de la parte recurrente; *Rina Biaggi García* y *Marcos Ramírez Lavandero*, abogados de la parte recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Luego de haber analizado las distintas mociones presentadas por los demandados, entendemos que procede denegarlas.

Primero que todo, quisiéramos recalcar que estamos ante un caso que nos fue certificado desde el Tribunal de Primera Instancia y en el cual, por ende, actuamos en primera instancia. La acción versa sobre una petición de

*injunction* preliminar y permanente. Este Tribunal todo lo que hizo fue emitir un *injunction* preliminar que, por su propia naturaleza, es de duración limitada; sólo permanecerá en vigor hasta que el foro de instancia decida si procede o no dictar el permanente. También por su naturaleza el *injunction* permanente prohibitivo que podría emitir el foro de instancia sólo tendría efecto sobre las actuaciones futuras del Estado Libre Asociado y sus funcionarios, los actuales y sus sucesores, en cuanto éstas sean incompatibles con las normas constitucionales aplicadas en este caso.([1])

Resulta obvio, pues, que la preocupación, tanto de los demandados como de los Jueces Asociados Señores Rebollo López y Corrada Del Río, versa sobre la aplicación de nuestros pronunciamientos constitucionales a los hechos de este caso en lo que respecta a la posible concesión de remedios accesorios por el foro de instancia. Los demandados no cuestionan el *injunction* preliminar en sí ni la posible concesión de un *injunction* permanente por el foro de instancia.

Todo lo que este Tribunal ha resuelto hasta estos momentos es que en cuanto al *injunction* preliminar se le aplicará la norma constitucional según la hemos interpretado. También deberá aplicarse esta norma en el foro de instancia al determinar si procede o no dictar el *injunction* permanente. Si dijéramos que esta norma constitucional sobre el uso de fondos públicos no aplica a este caso, una petición de *injunction* preliminar y permanente, tendría-

---

([1]) Cabe resaltar que mediante la orden que emitiera este Tribunal, se prohíbe a todos los funcionarios públicos, y a sus sucesores, incurrir en conducta violatoria de las normas constitucionales aplicadas. Este hecho permite que se rebase cualquier argumento de academicidad en cuanto a la orden emitida por este Tribunal, o que pueda emitir el tribunal de instancia, a la luz de la veda publicitaria que impone la Ley Electoral de Puerto Rico en su Art. 8.001 (16 L.P.R.A. sec. 3351) durante el año en curso. Tanto la norma aplicada como el posible *injunction* permanente que pueda dictar el foro de instancia sobrepasan las limitaciones de tiempo, por lo que la citada prohibición expresa que impone la Ley Electoral de Puerto Rico no vuelve académico el remedio.

mos necesariamente que desestimar la acción, pues tanto el *injunction* preliminar como el permanente carecerían de apoyo legal. Esto sería un contrasentido en cuanto a la posición adoptada por la mayoría de este Tribunal.

En cuanto a los remedios accesorios en sí, su procedencia aún no ha sido determinada. Tampoco se ha pasado juicio, ni por el tribunal de instancia ni por los foros apelativos, sobre la forma y manera en que aplicará la norma constitucional sobre el uso de fondos públicos a estos remedios, si es que éstos proceden. Cualquier determinación en estos momentos sobre estos remedios sería prematura.

El estado procesal reseñado impide que nos expresemos en este momento sobre los planteamientos de prospectividad, en consideración a los principios básicos de justiciabilidad. Como se sabe, la doctrina de opinión consultiva es fuente de la restricción de la expresión judicial que se autoimponen los tribunales, de suerte que no emitan "decisiones en el vacío, en el abstracto o bajo hipótesis de índole especulativa". *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 721 (1980). La función de los tribunales no es actuar como asesores o consejeros, sino adjudicar controversias reales que legítimamente se le presenten. Ya hemos señalado que "cuando la controversia planteada en un caso no está completa o lista para su adjudicación, la opinión que emita este Tribunal es de naturaleza consultiva y es deber del Tribunal, dependiendo de las circunstancias del caso, desestimar el recurso desde su [origen] o desestimar la revisión sin considerar los méritos de los planteamientos". *Noriega v. Hernández Colón*, 135 D.P.R. 406, 442 (1994).

Los aspectos procesales que hemos señalado en relación con este caso hacen que en este momento no exista una controversia real que este Tribunal pueda adjudicar. Cualquier expresión sobre los planteamientos de prospectividad esgrimidos iría dirigida contra remedios accesorios cuya

procedencia aún no ha sido adjudicada. Sería, pues, meramente consultiva y, en consecuencia, improcedente.

Por lo tanto, este Tribunal no se encuentra ante un deber ministerial de resolver los planteamientos de prospectividad esgrimidos; se confronta con una petición prematura de un remedio que, correctamente, procede a denegar.

Por todo lo antes expuesto, *se dictará sentencia denegando todas las mociones de reconsideración y disponiendo que los demandados deberán atenerse a lo resuelto.*

El Juez Asociado Señor Negrón García emitió una opinión concurrente y disidente. El Juez Asociado Señor Rebollo López emitió una opinión disidente. El Juez Asociado Señor Corrada Del Río emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Rebollo López.

## — O —

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

### I

En lo sustantivo, *primero*, reiteramos que

[*l*]*os funcionarios del gobierno central o municipal en el poder no tienen derecho a usar el dinero público para su reelección; en este sentido, el Estado y la administración de turno no son sinónimos. Este criterio y rigor jurídicos de juzgar no son nuevo.* Desde el voto disidente en *P.P.D. v. Junta Revisora Electoral,* 109 D.P.R. 464, 465 (1980), consignamos "nuestro deber judicial darle virtualidad y convertir en realidad el ideal legislativo de *igualdad* en el debate político". (Énfasis en el original.) *Hace mucho tiempo descubrimos* que "[l]a igualdad es ingrediente medular del ideal de justicia que constantemente *late* en la Constitución. Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones". (Énfasis suplido.) *P.R.P. v. E.L.A.,* 115 D.P.R. 631, 633 (1984). *P.P.D. v. Gobernador I,* 139 D.P.R. 643, 708–709 (1995), opinión concurrente.

*Segundo*, la divulgación y el proselitismo no debe continuar girando contra el tesoro público.

> *El escalpelo judicial ha de usarse con mano firme para intentar erradicar permanentemente ese mal.* La cuestión reclama remediar el malgasto y cristalizar la justa y auténtica aspiración de todo un pueblo que pide, quiere y merece la mejor, más recta y escrupulosa administración de sus fondos. *No debe, pues, opacarse la trascendencia del asunto principal ("issue") ante nos. Se trata de millonarios recursos del pueblo que hacen mucha falta y que se desvanecen en la atmósfera de las ondas radiales, televisivas y el papel impreso.* Grandes recursos económicos que, so pretexto de informar, se emplean en proselitismo partidista, en detrimento de hospitales, medicinas, escuelas, libros, viviendas, seguridad pública, mejores salarios, etc. (Énfasis en el original.) *P.P.D. v. Gobernador I*, supra, pág. 712.

*Tercero*,

> [l]a veda sobre gastos de difusión pública del Gobierno establecida en el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, sólo es una prohibición y limitación *estatutarias* impuesta a los gastos gubernamentales de publicidad. Excepto por las disposiciones del Fondo Electoral, vale aclarar que *la Ley Electoral de Puerto Rico prohíbe siempre el uso de fondos públicos para pagar anuncios político-partidistas.* (Énfasis en el original y escolio omitido.) *P.P.D. v. Gobernador I*, supra, pág. 715.

*Cuarto*, la legislación sobre la veda, antes mencionada, no eclipsa nuestra Constitución, "portaestandarte de *una prohibición de rango superior y anterior a la veda estatutaria*". (Énfasis en el original.) *P.P.D. v. Gobernador I*, supra, pág. 717.

*Quinto*,

> [e]n su sustrato, anunciar alegados logros ("compromisos cumplidos"), otras metas y proyectos, no es otra cosa que iniciar y llevar una campaña de reelección *antes* del período preeleccionario en que se activa expresamente la veda electoral. Es *enmascarar* el proselitismo y utilizar impermisiblemente los fondos públicos para fines privados: reelección del incumbente y retención del poder del partido político. *Semejante práctica*

*debe suspenderse para siempre.* (Énfasis en el original.) *P.P.D. v. Gobernador I*, supra, págs. 726–727.

Choca contra el esquema estatutario que rige y *controla* la facultad gubernamental de informar legítimamente a la ciudadanía según la Ley Núm. 141 de 29 de abril de 1949, enmendada por la Ley Núm. 52 de 6 de agosto de 1994 (3 L.P.R.A. secs. 946–947) y la Ley de Contabilidad del Gobierno de Puerto Rico —Ley Núm. 230 de 23 de julio de 1974 (3 L.P.R.A. secs. 283–283p)— que, como principio rector, impone a todo funcionario el deber de evitar gastos "extravagantes, excesivos e innecesarios".

*Sexto,*

...*desde 1974* la Asamblea Legislativa estableció *permanentemente* el principio de *austeridad* en los gastos con fondos públicos y que éstos están sujetos al criterio de *razonabilidad* (no extravagantes, excesivos o innecesarios). *En consecuencia, la legalidad de todo anuncio gubernamental también está sujeta a estos criterios legislativos; cualquier otra conclusión atentaría contra los principios más básicos de sana administración y contabilidad públicas.* (Énfasis en el original.) *P.P.D. v. Gobernador I*, supra, pág. 735.

*Séptimo,*

[d]entro del concepto de la divulgación legítima que la buena administración gubernamental requiere, una cosa es el anuncio público sobrio y suficiente, y otra, muy distinta, el *bombardeo publicitario.* Esto último incide cuando lo primero se repite en los medios excesivamente. ...

En este sentido, además de los controles de formato y contenido de la Ley Núm. 52, *supra —veraz, completo y objetivo* (no político-partidista)— uno de los factores principales sujeto al eventual escrutinio judicial en la determinación de si anuncios subsidiados con fondos públicos cumplen con el criterio de *razonabilidad* (no extravagantes, ni excesivos o innecesarios) expuesto en la Ley de Contabilidad del Gobierno de Puerto Rico, es el *número de veces* que se publican en los periódicos, revistas y folletos o se transmiten por la radio, televisión y cines. (Énfasis en el original.) *P.P.D. v. Gobernador I*, supra, págs. 735–736.

Con vista a estos preceptos constitucionales, preceden-

tes judiciales y leyes vigentes, en sus méritos, no procede el reclamo de que la decisión sólo tenga efectos prospectivos. Las variantes fácticas entre el caso de autos y los anteriores no la convierten en una *nueva regla*.

## II

Preocupa, sin embargo, que la mayoría otra vez *posponga* la cuestión a base de que "[e]ste Tribunal todo lo que hizo fue emitir un *injunction* preliminar que, por su propia naturaleza, es de duración limitada ...". Opinión mayoritaria, pág. 53. El argumento pasa por alto que los importantes pronunciamientos decisorios constitucionales y la razón de decidir mayoritaria constituyen *Ley del Caso*.

Argüendo que actuamos como tribunal *en primera instancia*, ello no desnaturaliza nuestra condición de *atalaya constitucional* y foro de *última instancia*. No podemos ignorar que, con carácter definitivo, ya adjudicamos la inconstitucionalidad *de jure* y *fáctica* de los anuncios, que son objeto del pleito, publicados por el Gobierno central. Al así hacerlo, resolvimos en *contra* de todas las defensas y los planteamientos formulados por los demandados. Sinceramente nos preguntamos, sobre esos extremos, ¿queda algo más que discutir y juzgar?

Esa adjudicación jurídico-constitucional y fáctica no es susceptible de ser descartada ni modificada por el ilustrado tribunal de instancia; ésta indefectiblemente gobierna su curso de acción ulterior.

## III

*Procesalmente*, la proyección futura de todo *injunction* no es suficiente razón ni justifica la abstención mayoritaria para resolver la cuestión de retroactividad. Si se acepta que la orden prohíbe *a todos los funcionarios públicos* y a

*sus sucesores*, ¿no entraña ello precisamente el rasgo definitorio de un *injunction* permanente?

Aducir, en estos momentos, un posible *"injunction" permanente* es simplemente perder de vista que el 1ro de enero de 1996 *entró en vigor la legislación sobre una veda electoral*. Desde entonces, y por los próximos diez (10) meses, ese remedio extraordinario —caracterizado por su perentoriedad o urgencia— no procede y es *académico*.

Para todo efecto práctico y decisorio, es innecesario hablar en *esta etapa* de *"injunction" permanente*. A menos, claro está, que se sostenga la tesis de que el tribunal de instancia debe posponer su consideración por diez (10) meses o dilucidarla ahora para *emitirlo con vigencia y eficacia al otro día de celebrarse las elecciones generales, a saber, el miércoles 6 de noviembre de 1996*. En resumen, la posibilidad de discutir y ventilar el *"injunction" permanente* terminó. Si presumimos que no fuera académico, es obvio que *los términos absolutos* de nuestra decisión *obligan* al tribunal de instancia a *emitirlo*, sin nada más que discutir.

Queda sólo dirimir los posibles remedios económicos, a la luz de los reclamos y las defensas recíprocas que se hagan las partes.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

Solía decir con cierta ironía un abogado —ser humano muy querido para el Juez suscribiente— que una de las "cualidades" que, *aparente y desafortunadamente*, tenía que tener un juez *era la de poseer mala memoria*; palabras que, con tristeza, dicho abogado expresaba en aquellas ocasiones en que era "víctima" de una decisión judicial que resultaba contradictoria a otras anteriores emitidas por el mismo magistrado. Se refería dicho abogado, *naturalmente*, a la desafortunada *situación en que un tribunal de*

*justicia se olvida del precedente que estableció, o de lo que resolvió en un caso anterior, y procede a decidir en forma contraria, olvidándose de lo que ayer expresó y resolvió.*

I

La mayoría de los integrantes del Tribunal, utilizando innecesariamente el mecanismo procesal decisorio de la "opinión", *insiste* en decir que está impedida de resolver, en estos momentos, si la norma que estableció el pasado 22 de diciembre de 1995 debe tener, o no, carácter prospectivo. Ello, alegadamente, por razón de que dicha determinación conlleva necesariamente expresarse sobre unos "remedios accesorios" al caso ante nos —entiéndase, reclamaciones de daños— lo que, conforme la mayoría, constituiría emitir una "opinión consultiva"; determinación *errónea* que causa que el asunto tenga que ser dilucidado, de manera primaria, a nivel de instancia, con el consabido perjuicio para una de las partes en el presente caso y para otros que todavía no han acudido al foro judicial a reclamar sus derechos.

En dicha ocasión, esto es, el 22 de diciembre de 1995, este Tribunal, de manera mayoritaria, implantó la norma a los efectos de que el Gobierno está impedido de utilizar fondos públicos en una campaña publicitaria que contiene connotaciones político-partidista, aun en años no eleccionarios. *Además*, claramente le reconoció *facultad* al foro de instancia "para ordenar cualquier otro remedio que en derecho proceda, *incluso la compensación de los daños sufridos por la parte demandante*, todo ello después de dar oportunidad a la parte demandada *de ser oída y presentar sus defensas*". (Énfasis en el original suprimido y énfasis suplido.) *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 704 (1995).

Esto es, la mayoría erróneamente decidió que la parte demandante, Partido Popular Democrático (P.P.D.), en efecto había sufrido un *daño especial* como consecuencia de

la campaña publicitaria del Gobierno que este Tribunal declaró ilegal. Dicha expresión, *no hay duda,* forma parte de la opinión mayoritaria emitida en el presente caso. Ese hecho *no* puede ser negado por persona alguna. Un somero examen de la opinión mayoritaria así claramente lo demuestra. Tampoco puede haber la menor duda sobre el hecho de que el daño, reconocido por la mayoría, es de "naturaleza especial", por cuanto dicha expresión del Tribunal necesariamente *no* podía referirse al "daño político", de "carácter irreparable", que alegó el P.P.D. para cumplir con el *requisito* de la expedición de un *injunction.*

*Ahora bien, ¿qué quiso "decir", o qué propósito tuvo, la mayoría de los integrantes del Tribunal al así expresarse?* Para poder contestar, y apreciar, correctamente esa pregunta, debe recordarse, *en primer lugar,* que la parte demandante en este caso, esto es, el Partido Popular Democrático, *no* reclamó compensación por *daño especial* alguno en la acción judicial que originalmente radicara ante el foro de instancia *como tampoco* presentó prueba alguna, a esos efectos, en la vista evidenciaria que dicho foro posteriormente celebró por órdenes de este Tribunal. La referida parte demandante se limitó, repetimos, a abogar que la campaña publicitaria en controversia le causaba un "daño político"; el cual era de carácter irreparable.

Tampoco debe perderse de vista el hecho de que la acción del Tribunal, de motu proprio reconocerle a la parte demandante el derecho a recibir compensación por un "daño especial" *supuestamente* recibido por dicha parte, *contraviene* el *principio rector* en nuestro ordenamiento jurídico a los efectos de que nuestro sistema de derecho es "rogado", donde aquél que reclama un daño debe alegarlo y probarlo.[1]

En consecuencia, *esta expresión, o acción, del Tribunal*

---

[1] Véanse: Regla 10(B) de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV; *Asoc. Auténtica Empl. v. Municipio de Bayamón,* 111 D.P.R. 527, 531 (1981).

Respecto a la reclamación de "daños especiales", véase, en particular, la Regla 7.4 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III.

*tiene que haber sido una pensada, discutida, razonada y, finalmente, plasmada en la opinión del Tribunal por los integrantes de la mayoría con un propósito o fin concreto y específico.* Ello así ya que nos negamos a aceptar que la mayoría de los integrantes del Tribunal puedan haber hecho constar un asunto tan delicado, importante e improcedente como éste de manera impensada y sin saber para que lo estaban haciendo; sobre todo, *repetimos,* cuando dicho planteamiento *no* había sido objeto de alegación o reclamación por la parte demandante.

Procede que se enfatice en cuanto a este aspecto, por último, el hecho de que conforme lo expresado por la mayoría, reconociendo la existencia del "daño especial" alegadamente sufrido por el P.P.D., la función del foro de instancia *se limita* a proceder a *cuantificar* dicho daño, luego de brindarle la oportunidad a la parte demandada "de ser oída y presentar sus defensas". (Énfasis suprimido.) *P.P.D. v. Gobernador I,* supra, pág. 704.

## II

Independientemente de la posición que hoy asume esa mayoría —a los efectos de que ellos no dijeron, ni resolvieron el 22 de diciembre de 1995, que el Partido Popular Democrático había sufrido un "daño especial"— *¿qué efectos necesariamente ha de tener, a nivel de instancia, ese "reconocimiento" que se le hizo al tribunal de instancia de la facultad de proceder a fijar la cuantía de daños "sufridos" por el partido político demandante?*

No hay que ser muy perspicaz, ni inteligente, para poder darse uno cuenta que dicho partido político demandante, al recibo del mandato, prontamente solicitará permiso para enmendar su demanda e incluir en la misma una reclamación por los supuestos daños, *que el Tribunal Supremo ya le reconoció,* que sufrió como consecuencia de la campaña publicitaria proscrita.

*¿Qué consecuencias, repetimos, tendrá esta situación?* A manera de ejemplo, se nos ocurre pensar en las muchas deposiciones que serán señaladas para ser tomadas a los distintos funcionarios del Gobierno que son parte en el pleito y/o a aquellos otros que puedan tener "conocimiento" de los hechos y de las muchas vistas que tendrán que ser celebradas a nivel de instancia con el propósito de dilucidar las muchas y variadas controversias que surgirán con motivo de las primeras.

Dicho de manera más sencilla, durante los próximos meses, *y antes de la celebración de las elecciones generales pautadas para este año,* tanto el Señor Gobernador de Puerto Rico como los distintos Secretarios del Gobierno, que son partes en el pleito, y otros funcionarios, tendrán que dedicar su valioso tiempo a prepararse y a participar en tomas de deposiciones y vistas, las cuales, nos atrevemos a pronosticar, serán de larga duración; *todo ello durante el año de elecciones y con el consabido perjuicio no sólo para el partido de gobierno sino que para el Pueblo de Puerto Rico.*

## III

*¿Cómo se podría evitar toda esta innecesaria situación?* Entre otras, *corrigiendo o rectificando el error cometido, esto es, determinando que no procede la compensación de daño alguno al P.P.D.* —por las razones y fundamentos que expresamos en nuestro Voto particular de 25 de enero de 1996 a los efectos de que, si acaso, se trata de un "daño" político especulativo, imposible de ser cuantificado— *o correctamente resolviendo, en el día de hoy, que la norma implantada en la opinión mayoritaria, emitida el pasado 22 de diciembre de 1995, debe tener aplicación prospectiva.*[2]

---

[2] Ello por los anteriores y correctos fundamentos de derecho que expone el Juez Asociado Señor Corrada Del Río en la opinión disidente que emite en el día de

La mayoría insiste, *sin embargo*, en decir que esta cuestión es una prematura por cuanto no es cierto que haya reconocido ni decidido que el P.P.D. haya sufrido daño alguno y que, para poder el Tribunal decidir si la norma implantada debe tener efectos prospectivos, se requiere, antes, la presentación de prueba sobre "remedios accesorios", esto es, daños, a nivel de instancia. *¿Es realmente ello así?* Creemos que no.

De entrada, debe señalarse que la *única* manera, desde un punto de vista jurídico correcto, en que podría considerarse que de así expresarse el Tribunal, ello constituiría una "opinión consultiva", es si no existiera un "caso o controversia" o si el mismo, aun existiendo caso o controversia, requiriera de la presentación de prueba a nivel de instancia.

En relación al planteamiento de la mayoría sobre la *supuesta* ausencia de "controversia real", sólo podemos decir —*con cariño y respeto*— que el mismo es uno de los más erróneos de que hemos sido testigo en nuestra vida profesional. La *controversia* en el presente caso giraba sobre la legalidad o ilegalidad de la campaña publicitaria que llevó a cabo el presente gobierno durante el 1995; *no* sobre si el P.P.D. había o no sufrido daños con motivo de la misma. Este Tribunal resolvió dicha controversia. Decidió que el uso de fondos públicos, inclusive durante años no eleccionarios, en una campaña publicitaria, que tiene carácter político partidista, era ilegal.

Esa fue la norma implantada en el caso. A esos efectos, debe mantenerse presente que todas las decisiones que emite este Tribunal tienen efectos retroactivos; *esto es, las decisiones nuestras únicamente, tienen efectos prospectivos cuando así expresamente lo determinamos.* Un examen de nuestra jurisprudencia así plenamente lo demuestra.

Meramente a manera de ejemplo, tenemos el caso de *Noriega v. Gobernador*, 122 D.P.R. 650 (1988). En el refe-

---

hoy; ponencia que suscribimos y a la cual nos unimos.

rido caso, declaramos inconstitucional —*mediante el mecanismo procesal decisorio del injunction*— la práctica de la Policía de Puerto Rico, o del Estado Libre Asociado de Puerto Rico, de levantar expedientes, carpetas, listas, ficheros, etc. de personas, agrupaciones y organizaciones, única y exclusivamente por motivo de las creencias políticas o ideológicas de éstas. Esa fue la *norma* establecida por este Tribunal. Devolvimos el caso al foro de instancia para la continuación de procedimientos, *"permitiendo"* que las personas, agrupaciones y organizaciones perjudicadas por la práctica, decretada inconstitucional, procedieran a radicar las acciones de daños y perjuicios que entendieran procedentes en derecho.

Por otro lado, tenemos el caso de *Quiles Rodríguez v. Supte. Policía*, 139 D.P.R. 272 (1995). En dicho caso, al *reiterar* la norma establecida en *Díaz Martínez v. Policía de P.R.*, 134 D.P.R. 144 (1993), —caso en que habíamos resuelto que era inconstitucional la práctica de suspender sumariamente de sueldo y empleo a un empleado público de carrera sin la celebración antes de una vista informal— el Tribunal hizo constar, *de manera expresa*, que la referida norma sólo tendría efectos prospectivos.

Podríamos continuar citando casos a los mismos efectos. Creemos que ello *no* es necesario. Somos del criterio que no puede ser objeto de discusión alguna el hecho de que este Tribunal tiene facultad para, *en estos momentos*, determinar si la norma que estableciéramos el pasado 22 de diciembre debe tener, o no, efectos prospectivos *sin necesidad* de que se presente prueba alguna sobre daños a nivel de instancia; *sobre todo, cuando consideramos el hecho de que este Tribunal está actuando en el presente caso en "jurisdicción" original, situación que plenamente le faculta para hacer dicha determinación.*[3]

---

[3] No obstante lo anteriormente expresado, es un hecho incontrovertido que este Tribunal ya reconoció y decidió, en la opinión mayoritaria que emitiera el pasado 22 de diciembre de 1995, que el Partido Popular Democrático efectivamente

## IV

*Debe mantenerse presente que la determinación sobre retroactividad o prospectividad de una norma jurisprudencial no requiere la presentación de prueba a nivel de instancia.* Recordemos que en *Quiles Rodríguez v. Supte. Policía,* ante, pág. 277, este Tribunal expresó que los "criterios rectores", al momento de determinar sobre la retroactividad o prospectividad de una norma jurisprudencial, *son*:

> ... (1) el *propósito* que persigue la nueva regla a los fines de determinar si su retroactividad lo adelanta; (2) la *confianza* que se depositó en la antigua norma, y (3) el *efecto* de la nueva regla en la administración de la justicia. Ello no obstante, la última determinación descansará en las consideraciones de índole social, a la luz de los hechos y las circunstancias particulares de cada caso. *Gorbea Vallés v. Registrador,* supra; *Pueblo v. Báez Cintrón,* 102 D.P.R. 30 (1974); *Pueblo v. Cruz Jiménez,* 99 D.P.R. 565 (1971). (Énfasis suplido.)

Una *somera* lectura de los tres (3) criterios antes señalados es todo lo que se necesita para poder asegurar, sin temor a equivocarse, que nadie puede ser capaz de argumentar —con cara seria— que la determinación de los mismos requiere la presentación de prueba a nivel de instancia. *Esto es, y dicho de la manera más sencilla posible, este Tribunal puede determinar*: cuál es el *propósito* de la nueva norma que nosotros mismos establecimos, la *confianza* que se había depositado en la "vieja" norma, y, ciertamente, el *efecto* en la administración de la justicia de la nueva norma, *sin necesidad alguna de que el foro de ins-*

---

sufrió un daño como consecuencia de la campaña publicitaria que declaramos ilegal. *P.P.D. v. Gobernador I,* 139 D.P.R. 643 (1995). Negar ese hecho no sólo resulta ser ridículo sino que absurdo. *La "mala memoria" que afecta a la mayoría es, realmente, inexplicable.*

Recordemos que el caso se devolvió al foro de instancia para que éste procediera a fijar la cuantía de los daños, luego de darle el "debido proceso de ley" a la parte demandada. Esta acción, de hecho, representa que el Tribunal ya le dio, carácter retroactivo a la norma que implantara el pasado 22 de diciembre de 1995.

*tancia reciba prueba sobre daños. Dicha situación, realmente, plantea una cuestión de derecho.*

## V.

La mayoría de los integrantes del Tribunal —al decir que "[c]ualquier expresión sobre los planteamientos de prospectividad esgrimidos iría dirigida contra remedios accesorios cuya procedencia aun no ha sido adjudicada", razón por la cual cualquier expresión a esos efectos, conforme la mayoría, sería "meramente consultiva y, en consecuencia, improcedente", opinión mayoritaria, pág. 55— *inexplicable y lamentablemente* confunde la situación particular del P.P.D., *parte demandante en el presente caso*, con la de *otras* posibles, y futuras, partes en pleitos que pudieran radicarse en el futuro, esto es, por corporaciones que prestaron servicios al gobierno en la campaña publicitaria y que, con toda probabilidad, demandarán a éste en el futuro en cobro de dichos servicios.

En cuanto al P.P.D., repetimos, éste lo que sufrió, como consecuencia de la campaña publicitaria impugnada, fue un "daño político". Dicho "daño político", no hay duda, es el que sirve de base precisamente para la expedición del *injunction* preliminar y, en su día, del *injunction* permanente. Ahora bien, el referido daño no sólo resulta especulativo, por cuanto el mismo no puede ser precisado, sino que es imposible de cuantificar por un tribunal de justicia; ello por las razones que expresáramos en el voto particular que emitiéramos el pasado 25 de enero de 1996. *Dicho de otra forma, el P.P.D. no tiene "remedios accesorios" adicionales, por no decir daños, que reclamar en este pleito.*

Por *todo* lo anteriormente expresado es que, *precisamente*, resulta verdaderamente difícil de entender, *y de aceptar desde un punto de vista jurídico*, las expresiones que hiciera la mayoría, en la opinión que emitiera el 22 de diciembre de 1995, a los efectos de reconocerle la facultad

al tribunal de instancia para conceder cualquier otro remedio, "incluso la compensación de los daños sufridos por la parte demandante"; "reconocimiento", y expresiones, que niega la mayoría tan siquiera haber hecho. (Énfasis suprimido.) *P.P.D. v. Gobernador I,* supra, pág. 704.

Ahora bien, y en relación con los posibles pleitos que en el futuro puedan ser radicados por corporaciones o ciudadanos que prestaron sus servicios al Gobierno y/o a las agencias en dicha campaña publicitaria, *no* hay duda de que si la norma que implantamos el pasado 22 de diciembre tiene efecto *retroactivo,* dichas personas o corporaciones *no* podrán cobrar dichos servicios. Tampoco debe haber duda de que, si *resolvemos* que dicha norma jurisprudencial únicamente tiene efecto *prospectivo,* dichos individuos y corporaciones *sí* podrán hacerlo.

*Cabe que nos preguntemos,* ¿por qué razón debe esperarse hasta que se radiquen y se resuelvan esos casos para que este Tribunal se exprese al respecto? *Esto es,* ¿es justo que obliguemos a esas personas y corporaciones a contratar abogados, con el consabido gasto que ello conlleva; que tanto ellos, como los tribunales de instancia, le dediquen tiempo y esfuerzo a dilucidar dichos casos; para que luego este Tribunal resuelva que no tienen derecho a recobrar dichos servicios debido a que la norma establecida el pasado 22 de diciembre de 1995 no es de efecto prospectivo? *Dicho de una manera más sencilla,* ¿no sería más conveniente, para todos, que este Tribunal tomara dicha decisión en estos momentos?

Repetimos, *no* hay razón *jurídica* alguna que impida que este Tribunal decida, *en estos momentos,* si la norma que estableciéramos el pasado 22 de diciembre debe, o no, tener efecto prospectivo. La excusa de que no hay "caso o controversia" hasta que esas "acciones accesorias" sean radicadas ciertamente *no* es más que eso, *una pobre excusa,* la cual resulta ser *una errónea y lamentable.*

## VI

*En conclusión*, lo que el Tribunal está fomentando que suceda —al sostener que no dijo lo que entonces dijo, esto es, al pretender negar lo innegable; al negarse a rectificar dicha situación, y al negarse a resolver, en estos momentos, si la norma implantada debe, o no, tener efectos prospectivos— es que, a nivel de instancia, las partes en el presente pleito, y otros en el futuro inmediato, se envuelvan en *largos y complejos* procesos litigiosos de manera totalmente innecesaria.

Esta incomprensible actitud, producto la misma de una impermisible arrogancia judicial —esto es, de no querer resolver, en estos momentos, *sin razón válida alguna*, si la decisión mayoritaria de 22 de diciembre de 1995 tiene, o no, efectos prospectivos— *no sólo* le causa un grave perjuicio a todas esas personas y corporaciones *sino que* la misma ciertamente perjudica la imagen y buen nombre de esta Institución. *Después de todo, alguien le debe recordar a los integrantes de este Tribunal que no somos los "dioses del Olimpo".*

— O —

Opinión disidente emitida por el Juez Asociado Señor Corrada Del Río, a la cual se une el Juez Asociado Señor Rebollo López.

En la dinámica social de la que trata el Derecho, el ser humano habrá de depositar su confianza en la norma prevaleciente y con ella en mente habrá de actuar. Si actuó mal, confiando en una norma equívoca, luego al revisar la actuación y revocar la norma no podemos hacernos los ciegos ante la conducta pasada y la importancia de sus efectos. Consideraciones de política pública y de orden so-

cial, más que de estricto derecho, se imponen como antesala a cualquier posible análisis o acto ulterior.([1])

Una decisión judicial puede tener tanto un efecto retroactivo como prospectivo. Esto es por razón de que " 'la absoluta retroactividad sería la muerte de la seguridad y la ... confianza pública, y la absoluta irretroactividad sería la muerte del desenvolvimiento del derecho' ".([2])

En *Gorbea Vallés v. Registrador*, 131 D.P.R. 10, 16 (1992), expresamos que "[s]on innumerables las ocasiones en que nos hemos dado a la tarea de darle vigencia prospectiva a ciertas doctrinas jurídicas. El criterio para seleccionar una u otra alternativa muchas veces es *ad hoc*, dependiendo de la situación fáctica, circunstancias del caso en particular y consideraciones de equidad y hermenéutica". (Citas omitidas.)

Es incuestionable que en la totalidad de los casos en que se han emitido dictámenes judiciales, en los que se pretende una aplicación prospectiva, *ha sido responsabilidad absoluta del foro judicial que emite el dictamen* disponer si su aplicación será de carácter prospectivo o retroactivo.

Es un deber institucional de este Tribunal dejar establecido en el caso de autos si los criterios que nosotros mismos esbozamos al momento de tomar la decisión, que son objeto de la Segunda Moción de Reconsideración presentada por los demandados en el caso Civil Núm. CT-95-10 el 30 de enero de 1996, tendrán aplicación prospectiva o retroactiva. No podemos válidamente argumentar que otro debe ser el criterio que prevalezca en cuanto a este asunto. Es un deber ministerial de este Tribunal resolver la controversia planteada sobre la aplicación retroactiva o prospectiva de nuestra determinación, en el caso de autos.

En *Quiles Rodríguez v. Supte. Policía*, 139 D.P.R. 272

---

([1]) R. Calderón Jiménez, *Retroactividad o prospectividad de las decisiones de los tribunales*, 53 (Núms. 2–3) Rev. C. Abo. P.R. 107 (1992).

([2]) *Quiles Rodríguez v. Supte. Policía*, 139 D.P.R. 272 (1995), citando a R. Calderón Jiménez, *supra*, pág. 207.

(1995), resolvimos que son los propios tribunales quienes están llamados a determinar si la aplicación de un dictamen se hará de forma prospectiva o retroactiva. Expresamos allí que "[e]n el ejercicio de esta discreción, son fundamentales las consideraciones de política pública y orden social, puesto que nuestro norte debe ser 'conceder remedios justos y equitativos que respondan a la mejor convivencia social' ". Íd., pág. 277.

Cumpliendo con ese deber ministerial que nos atañe, hoy debemos determinar si nuestra decisión, en el caso de epígrafe, debe tener un efecto retroactivo o si, por el contrario, tal y como aducen los demandados en su Segunda Moción de Reconsideración, ésta sólo debe aplicar prospectivamente.

El debido análisis de la cuestión planteada exige que examinemos la fuente y razón de la doctrina de irretroactividad o aplicación prospectiva de los fallos, los criterios elaborados para regir su uso, las críticas formuladas a estos criterios y el impacto sobre este caso de las conclusiones de todo lo anterior.

## I

En el caso de autos, mediante la opinión que emitiéramos el 22 de diciembre de 1995, *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995), estudiamos el alcance, a la luz de los hechos particulares del caso, de las disposiciones constitucionales que emanan del Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, que exige el uso de fondos públicos para un "fin público"; del Art. II, Sec. 2 de la Constitución del Estado Libre Asociado, *supra*, que establece que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral; así como el Art. VI de la Constitución del Estado Libre Aso-

ciado, *supra*, que ordena que se dispondrá por ley de todo lo concerniente al proceso electoral así como lo relativo a los partidos políticos y las candidaturas.

Sería injusto concluir que dado el hecho de que las referidas disposiciones constitucionales han estado vigentes desde el momento cuando entró en vigor la Constitución en 1952, los demandados han tenido conocimiento de su contenido, lo que convertiría la discusión de los planteamientos sobre la aplicación prospectiva en un ejercicio estéril. Sin embargo, nuestra historia constitucional nos obliga a pensar de otro modo.

Si bien es cierto que nuestra constitución dispone que sólo se podrán usar los fondos públicos para "fines públicos", no es menos cierto que la definición de lo que constituye un "fin público" tiene un carácter subjetivo que puede variar dependiendo del que lo defina. Así en la opinión de la mayoría en el caso de autos, expresamos que "[e]l concepto 'fin público' no es estático, sino que está ligado al bienestar general y que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja".[3] Así, a través de la historia de este Tribunal, hemos visto cómo se han autorizado el uso de fondos públicos para anuncios del Gobierno,[4] y se ha resuelto que en torno a la propaganda gubernamental "el Estado tiene amplísimos poderes"[5] a pesar de que las disposiciones constitucionales que aplicamos en este caso han estado vigentes en esas ocasiones. Obligarnos a concluir lo contrario haría prácticamente imposible nuestra labor como intérpretes finales de las leyes de nuestra jurisdicción, entre ellas nuestra ley suprema, la Constitución. Esto, ya que si partimos de la premisa de que las disposi-

---

[3] *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 686 (1995).

[4] *Noriega v. Hernández Colón*, 126 D.P.R. 42 (1990).

[5] *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993).

ciones tanto estatutarias como constitucionales establecen diáfanamente nuestros derechos, no hubiésemos tenido la oportunidad de crecer jurídicamente al interpretar la Constitución y encontrar otros tantos derechos que emanan de disposiciones constitucionales. Como discutiremos más adelante, entendemos que al no haberse establecido con anterioridad un precedente claro que dispusiera de la controversia planteada ante nos, la norma adoptada debe ser de aplicación prospectiva.

## II

La doctrina de irretroactividad de algunos fallos judiciales es de cuño relativamente reciente. *Pueblo v. Delgado Rodríguez*, 108 D.P.R. 196, 197 (1978). Esta técnica de aplicación prospectiva de los fallos se desarrolla principalmente en la jurisdicción federal. Ésta no deriva de disposición estatutaria o de disposiciones expresas en la Constitución federal o en la Constitución de Puerto Rico. No es hasta la decisión de *Rivera Escuté v. Jefe de Penitenciaría*, 92 D.P.R. 765 (1965), que este Tribunal adoptó la referida norma de aplicación prospectiva al aplicar a dicho caso los criterios esbozados por el Tribunal Supremo federal en *Linkletter v. Walker*, 381 U.S. 618 (1965). La doctrina de irretroactividad, tanto en la versión original expuesta en *Linkletter v. Walker*, supra, como en sus posteriores aplicaciones a otros casos ha sido objeto de un intenso debate. La generalidad de los estudiosos sobre esta materia considera que la doctrina de irretroactividad puede servir a propósitos útiles en varias situaciones específicas, pero que deben reexaminarse los criterios tradicionalmente empleados para regir su uso.[6]

---

[6] Véanse: T. Carpinello Homady, *Retroactivity of Constitutional Decisions—Criminal Procedure*, 23 Duq. L. Rev. 789 (1985); R.W. Ginn, *United States Supreme Court Changes in Determining Whether Judicial Decision Should Apply Retroactively*, 25 Creighton L. Rev. 29 (1991); J.B. Rossler, *Prospective Application of Judicial*

La formulación y el desarrollo de los criterios tradicionales para el empleo de la doctrina de aplicación prospectiva emanan principalmente de *Linkletter v. Walker,* supra; *Stovall v. Denno,* 388 U.S. 293, 297 (1967), y *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–107 (1971).

Tanto de la jurisprudencia como de los artículos de revistas antes citados emanan unos criterios fundamentales que debemos utilizar al determinar si un fallo judicial debe tener sólo efecto prospectivo. A grandes rasgos, estos criterios que evaluaremos en detalle más adelante son los siguientes:

1. El propósito que persigue la nueva regla a los fines de determinar si su retroactividad lo adelanta.

2. La confianza que se depositó en la antigua norma.

3. El efecto en la nueva norma en la administración de la justicia.

Sin embargo, algunos comentaristas han ido más lejos en la crítica del análisis de estos criterios, al punto de argumentar que "la técnica del efecto prospectivo debe utilizarse únicamente en aquéllos casos contados en que los fines de la justicia y del respeto a la ley exijan con toda claridad su empleo".[7] No debemos perder de perspectiva que en estos casos el problema fundamental que debemos resolver es el logro de la justicia, y para determinar esto debemos examinar si a la luz de los criterios antes esbozados podemos cumplir mejor con dicho propósito a través de la prospectividad que de la retroactividad.

Difícilmente podemos concebir un caso en el cual se justifique *tan abrumadoramente* la *aplicación prospectiva* de la norma o pauta establecida por este Tribunal que en el caso de autos.

---

*Decisions,* 33 Ala. L. Rev. 463 (1982); H. Schwartz, *Retroactivity, Reliability and Due Process: A Reaply to Professor Mishkin,* 33 U. Chi. L. Rev. 719 (1966); J. Bernard Corr, *Retroactivity: A Study in Supreme Court Doctrine "As Applied",* 61 N.C.L. Rev. 745 (1983).

[7] *Pueblo v. Delgado Rodríguez,* 108 D.P.R. 196, 203 (1978).

En *Quiles Rodríguez v. Supte. Policía*, supra, pág. 277, expresamos lo siguiente:

Anteriormente hemos reconocido como criterios rectores al momento de declarar la retroactividad o prospectividad de una norma jurisprudencial, los siguientes: (1) el propósito que persigue la nueva regla a los fines de determinar si su retroactividad lo adelanta; (2) la confianza que se depositó en la antigua norma, y (3) el efecto de la nueva regla en la administración de la justicia. *Ello no obstante, la última determinación descansará en las consideraciones de índole social, a la luz de los hechos y las circunstancias particulares de cada caso.* (Énfasis suplido.)

Examinemos con brevedad los tres (3) criterios antes enumerados y el criterio medular que se recoge al final del párrafo citado a los efectos de que "*la última determinación* descansará en *las consideraciones de índole social,* a la luz de los hechos y circunstancias particulares de cada caso". (Énfasis suplido.) *Quiles Rodríguez v. Supte. Policía,* supra, pág. 277.

A. *El propósito que persigue la nueva regla a los fines de determinar si su retroactividad lo adelanta.*

El caso de autos trata sobre una campaña específica de publicidad llevada a cabo por varias agencias de la Rama Ejecutiva del Gobierno de Puerto Rico para informar al Pueblo sobre sus programas, proyectos, logros, realizaciones, proyecciones o planes. Este tipo de campaña está expresamente prohibida durante el año electoral por el Art. 8.001 de la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, mejor conocida como la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, pero no así para los años preelectorales.

La mayoría de este Tribunal entendió que el uso de la frase "compromiso cumplido" así como el color azul y la palma de trasfondo convirtieron la campaña en una "de manifiesto corte político-partidista, subvencionada con una

gran cantidad de fondos públicos, so pretexto de cumplir con un fin público determinado".(8)

Dicha posición fue la que prevaleció de forma mayoritaria. A la luz de dicha opinión, este Tribunal emitió un *injunction* preliminar paralizando dicha campaña a partir de 22 de diciembre de 1995.(9)

El 1ro de enero de 1996 entró en vigor la prohibición establecida por el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, por lo que, además de prohibirse la campaña en cuestión por la orden de *injunction* preliminar que emitiera este Tribunal, tampoco podría realizarse dicha campaña durante el año electoral, aún si no hubiera mediado nuestra orden.

Tomamos conocimiento judicial de que el Gobernador de Puerto Rico firmó una Orden Ejecutiva el 25 de enero de 1996 para crear una comisión especial con el propósito de delimitar, a la luz de la ley y la jurisprudencia, la responsabilidad del Gobierno de informar. Dicha comisión debe rendir un informe en sesenta (60) días. Está integrada por la Secretaria de Estado; el Secretario de Justicia; tres (3) representantes de la Rama Legislativa, uno por cada delegación legislativa; un ex juez; representantes de la prensa escrita, radial y televisiva; representantes de las Escuelas de Comunicaciones de las distintas universidades; un representante del campo de las comunicaciones y relaciones públicas y representantes del sector religioso.

Las pautas establecidas en este caso evitarán en lo sucesivo el uso de fondos públicos bajo circunstancias similares a las de esta campaña, poniéndose en aviso a los funcionarios públicos concernidos de que no pueden llevar a

---

(8) *P.P.D. v. Gobernador I*, supra, pág. 701.

(9) En el caso principal que nos ocupa, *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, el P.P.D. no presentó su demanda hasta el 14 de noviembre de 1995. El 6 de diciembre de 1995 el tribunal de instancia declaró con lugar el *injunction* preliminar y ordenó la paralización de la campaña, lo cual acató la parte demandada mientras el asunto estuvo pendiente ante nos.

cabo este tipo de promoción. El darle carácter retroactivo a esta norma no la adelanta, puesto que la campaña ya fue totalmente paralizada por orden de este Tribunal. Por su propia naturaleza, el impacto y el efecto de la norma establecida en este caso tiene un carácter prospectivo.

B. *La confianza que se depositó en la antigua norma*

Es indudable que el caso de autos ha establecido un precedente respecto al uso de fondos públicos por el Gobierno para anunciar sus logros y programas.

El Juez Asociado Señor Hernández Denton así lo reconoce en su opinión de conformidad al expresar:

> *Nunca antes habíamos tenido ante nuestra consideración una controversia análoga.* Aunque en cuatrienios anteriores otros incumbentes también habían utilizado los medios de comunicación comerciales para anunciar sus logros, esta es la primera vez que unos partidos de oposición, tanto en el nivel municipal como en el central, cuestionan este tipo de campaña gubernamental multimillonaria durante el período preelectoral. (Énfasis suplido.) *P.P.D. v. Gobernador I*, supra, pág. 755.

Valga recordar, además, que el propio Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, prohíbe las campañas de logros y programas del Gobierno únicamente durante el año electoral, por lo que los funcionarios de gobierno confiaron en que podían anunciar sus logros y programas durante el período fuera de dicha veda.

Más aún, este Tribunal reconoció la facultad del Gobierno para anunciarse en los casos *C.E.E. v. Depto. de Estado*, supra; *Noriega v. Hernández Colón*, 126 D.P.R. 42 (1990), y *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368 (1984).

A juicio de la mayoria del Tribunal, el uso de la ·frase "compromiso cumplido", el color azul y la palma de trasfondo tuvo una connotación político-partidista. Se trata de una cuestión de apreciación. Es por ello que no podemos inferir que los funcionarios de gobierno involucrados obraron a ciencia y conciencia de que estuvieran vulnerando unos principios constitucionales claros.

En cuanto al uso de la palma en algunos anuncios, debemos señalar que ninguno de los anuncios en cuestión contiene el logo o la insignia de la palma tal como éste es utilizado por el P.N.P. en sus anuncios de campaña o en la papeleta electoral. Se trata, más bien, de algunas palmas según éstas surgen de la flora puertorriqueña que, como sabemos, es abundante en ofrecernos este tipo de árbol. El P.N.P. no es dueño de la palma ni el P.P.D. es dueño de la pava. La palma y la pava le pertenecen al Pueblo de Puerto Rico, como también son del pueblo —de todo el pueblo— el color azul y el color rojo. Lo que le pertenece al P.N.P. y al P.P.D. son unas insignias con un diseño y un logo específico de la palma y de la pava, respectivamente. La palma del P.N.P. es azul y no verde y la pava del P.P.D. es roja y no verde-amarilla. En los anuncios en cuestión no aparecen palmas azules ni insignias de la palma según las usa el P.N.P.

Evidentemente, el caso de autos no es análogo al de *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984), en el cual se trataba de tres (3) *insignias oficiales con el logo de la pava en rojo* que estaban colocadas en el vehículo oficial del Alcalde de dicho pueblo. Los funcionarios públicos involucrados en el caso de autos no podían asumir que la norma adoptada en el citado caso les aplicara, ya que en ningún momento utilizaron los logos o las insignias oficiales de ninguno de los partidos políticos debidamente inscritos en Puerto Rico.

Además, existe una alta probabilidad de que los oficiales de gobierno, a que se refiere el caso de autos, pudieran estar cobijados por una inmunidad cualificada al amparo de lo resuelto en *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). No cabe duda de que como cuestión de política pública es menester que los servidores públicos estén protegidos contra demandas presentadas en su contra por el hecho de haber ejercido de forma razonable y de buena fe funciones que contienen un elemento de *discreción*. Se persigue que estos funcionarios actúen con libertad y tomen decisiones sin sentir presiones y amenazas contra sus patrimonios.

*De Paz Lisk v. Aponte Roque*, 124 D.P.R. 472, 495 (1989). Más aún, cuando dichos servidores públicos desempeñan sus funciones a la luz de dictámenes judiciales o leyes que pueden razonablemente interpretarse como que autorizan sus actuaciones.([10])

C. *El efecto de la nueva regla en la administración de la Justicia*

En la eventualidad de que no le demos un carácter prospectivo a las normas establecidas en el caso de autos, estaríamos abriendo una caja de pandora que pudiera desencadenar un cúmulo de litigios sobre los anuncios y gastos de las administraciones de gobierno en Puerto Rico durante los últimos quince (15) años, sobrecargando a los tribunales con litigios en los cuales tendrían que evaluar sobre si los anuncios de las múltiples agencias de gobierno durante ese tiempo respondían o no a un fin público o si, por el contrario, dichos anuncios contenían mensajes de corte político-partidista. Ello ocasionaría no sólo un impacto adverso a la administración de la Justicia por razón de aumentar el número de casos pendientes ante los tribunales, sino que requeriría a los tribunales involucrarse en la determinación de cuestiones altamente especulativas, incluyendo la determinación de lo que constituye o no un daño político susceptible de ser cuantificado. De establecerse la norma con carácter prospectivo, y tomando en consideración el efecto preventivo que la decisión en el caso de autos sin duda tiene para evitar que se repita este tipo de campaña en el futuro, el impacto en el sistema de administración de la justicia sería mucho menor, lo cual redundará en beneficio para los miles de litigantes que acuden al sistema en búsqueda de justicia rápida en casos de otra naturaleza.

---

([10]) Véanse: *C.E.E. v. Depto. de Estado*, supra; *Noriega v. Hernández Colón*, supra; *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984), y el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351.

D. *Consideraciones de índole social, a la luz de los hechos y circunstancias particulares de cada caso*

No podemos perder de perspectiva que este caso, el Núm. CT-95-10, tiene como partes contendoras al P.P.D. contra el P.N.P., o sea, a los dos (2) partidos políticos principales de Puerto Rico durante los últimos veintiocho (28) años; que desde las elecciones de 1968 esos dos (2) partidos políticos se han venido disputando el poder; que en las últimas siete (7) elecciones generales efectuadas en nuestra isla uno (1) de esos dos (2) partidos ha logrado ganar la gobernación en cuatro (4) ocasiones y el otro en tres (3) ocasiones, lo que ha representado una serie de elecciones reñidas y campañas electorales sumamente intensas y disputadas y que nos encontramos de nuevo en un año electoral.

El impacto social de un pleito entre el P.N.P. y el P.P.D., en un año de elecciones, con demandas y contrademandas para reclamar daños por actuaciones de funcionarios de gobierno de uno y otro partido; con el uso de métodos de descubrimiento de prueba para tratar de obtener información que les sirva recíprocamente para obtener municiones de campaña, no es lo que conviene a Puerto Rico a los fines de la justicia.

La presentación de reclamaciones recíprocas por daños tendría el efecto de utilizar el proceso judicial para obtener supuestos resarcimientos o indemnizaciones que tendrían que provenir de los fondos para la campaña de uno u otro partido. Se pretendería utilizar el proceso judicial como un arma para ganar o perder las elecciones tratando cada partido de dejar al otro desprovisto de los recursos financieros para realizar su campaña. Este Tribunal no debe prestarse a permitir que eso ocurra. No es justo y mucho menos conveniente para nuestra sociedad, que después que las partes pretendan destruirse una a la otra, al final de la jornada nos reservemos el derecho de ·determinar que no se probaron los daños o que éstos no proceden. Puerto Rico

sufriría un daño irreparable de permitirse semejante contienda. *Somos nosotros, ahora*, quienes podemos prevenir la exacerbación de las pasiones políticas que un caso con este potencial inflamatorio puede crear en un año electoral.

Si hubo un daño irreparable por los anuncios, un resarcimiento por daños monetarios no lo va a reparar. El *injunction* preliminar que fue otorgado concedió un remedio más poderoso que una reparación por daños, que en última instancia son altamente especulativos y ni siquiera fueron reclamados.

Por otra parte, es sumamente injusto que la norma o pauta establecida en este caso afecte derechos contractuales entre las agencias del Gobierno, los proveedores de servicios, los subcontratistas y los medios de comunicación, lo cual podría traer alegaciones de que *ex post facto* se han menoscabado las obligaciones contractuales o que se ha violentado el debido proceso de ley.

Por estas consideraciones, determinaría la aplicación prospectiva de la decisión de este Tribunal.

## III

Se supone que la Rama Judicial, la rama no política del Gobierno, sirva para sosegar los ánimos en nuestra sociedad, apartándonos de las estridencias que frecuentemente se generan en otros ámbitos de nuestra vida de pueblo y, ciertamente, no debemos ser nosotros quienes le "echemos leña al fuego" o permitamos que uno u otro partido, mediante el proceso judicial, "arrime la brasa a su sardina". Este Tribunal, al conceder el *injunction* preliminar, tomó la decisión que estimó justa. Permitir una secuela de reclamaciones dentro de este pleito o en otros pleitos similares por no darle desde ahora efecto prospectivo a la decisión es permitir que se sigan dando golpes luego de sonar la campana. Si lo medular para determinar la retroactividad

o prospectividad de nuestra decisión es, como expresamos en *Quiles Rodríguez v. Supte. Policía*, supra, pág. 277, "consideraciones de índole social, a la luz de los hechos y las circunstancias particulares de cada caso", es un deber ineludible de este Tribunal reconsiderar la opinión y sentencia emitida, únicamente a los fines de darle carácter prospectivo a la norma y la pauta establecida, dejando en vigor el *injunction* preliminar.

Entendemos que no es prematuro pronunciarnos sobre la prospectividad de las normas o pautas establecidas en el caso de autos, ni que en esta etapa de los procedimientos una expresión sobre el particular sea consultiva. La confusión fue creada por la expresión inesperada y errónea de la opinión mayoritaria a los efectos de que "[i]gualmente se reconoce la facultad de dicho tribunal para ordenar cualquier otro remedio que en derecho proceda, incluso la compensación de los daños sufridos por la parte demandante, todo ello después de dar oportunidad a la parte demandada a ser oída y presentar sus defensas".([11]) Por otro lado, se dispuso en la opinión mayoritaria que "[s]e prohibirá, además, al Estado Libre Asociado de Puerto Rico, a los demás demandados y a sus agentes, funcionarios, empleados y mandatarios, el desembolso de fondos públicos para el pago de las publicaciones hechas de tales anuncios".([12]) Estas expresiones crean la necesidad de que determinemos ahora la aplicación prospectiva de las normas y pautas establecidas en el caso de autos.

En cuanto a la moción de reconsideración presentada por la Administración de Seguros de Salud de Puerto Rico (ASES) y su Director Ejecutivo Interino, entendemos que procede desestimar la causa de acción contra esta parte, ya que no surge de la prueba presentada ante nos ni la que tuvo ante sí el tribunal de instancia que la parte aquí re-

---

([11]) (Énfasis suprimido.) *P.P.D. v. Gobernador I*, supra, pág. 704.

([12]) (Énfasis suprimido.) Íd.

currida hubiese formulado una causa de acción que justifique la concesión de un remedio contra A.S.E.S.